FILED

2014 AUG 14  PM 1:43

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2014 Grand Jury **CR 14 00131**

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 14- |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(i)-(iii), §§ 1030(a)(4), (c)(3)(A), §§ 1030(b), |
| SU BIN,<br>  aka "Stephen Su,"<br>  aka "Stephen Subin,"<br>  aka "Steven Subin," | (c)(2)(B)(i)-(iii), (c)(3)(A): Unauthorized Computer Access; 18 U.S.C. § 371: Conspiracy; 18 |
| Defendant. | U.S.C. § 1832(a)(5): Conspiracy to Commit Theft of Trade Secrets; 18 U.S.C. § 2(a): Aiding and Abetting] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.    Defendant SU BIN, also known as ("aka") "Stephen Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU"), was a citizen of the People's Republic of China (hereinafter "China").

2.    Unindicted Co-conspirator 1 was a citizen of China and resided in China.

1    3.    Unindicted Co-conspirator 2 was a citizen of China and
2    resided in China.

3    4.    Defendant SU, Unindicted Co-conspirator 1, and Unindicted
4    Co-conspirator 2 e-mailed each other both in Chinese and English.

5    5.    Between in or about October 2008 and in or about May 2014,
6    defendant SU traveled to the United States multiple times, including
7    specifically:

8         a.    between on or about January 13, 2010, and on or about
9    January 24, 2010;

10        b.    between on or about February 11, 2010, and on or about
11   February 21, 2010;

12        c.    between on or about May 26, 2010, and on or about June
13   8, 2010;

14        d.    between on or about June 20, 2010, and on or about
15   June 27, 2010;

16        e.    between on or about September 8, 2010, and on or about
17   September 11, 2010;

18        f.    between on or about December 18, 2010, and on or about
19   December 28, 2010;

20        g.    between on or about June 30, 2011, and on or about
21   June 22, 2011;

22        h.    between on or about September 28, 2012, and on or
23   about October 3, 2012;

24        i.    between in or about October 2012 and on or about
25   November 3, 2012; and,

26        j.    between on or about December 31, 2012, and on or about
27   January 2, 2013.

28

6.   The Boeing Company (hereinafter "Boeing"), headquartered in Chicago, Illinois, was a company with offices throughout the United States that developed and sold military and commercial aircraft, among other goods; technologies; and related support services. Boeing had facilities in many locations, including Seal Beach and Long Beach, California.  The goods and technologies Boeing sold to its customers were sold and shipped, and were intended to be sold and shipped, in interstate and foreign commerce.

7.   One of the aircraft models that Boeing manufactured was the C-17 military transport aircraft ("the C-17"), including variants of the C-17, which was manufactured in Los Angeles County, California, located in the Central District of California.  The C-17 was developed over multiple years and produced by Boeing and its predecessor and subcontractors pursuant to contracts with the United States Air Force at a cost of billions of dollars.  Developing and producing the C-17 required the use of trade secrets and the use of export-controlled technical data.  Boeing maintained multiple computer servers containing files relating to the C-17, including servers in Orange County, California, containing detailed files necessary to make the component parts of the C-17.

8.   The F-35 "Lightning" was a fifth-generation fighter jet aircraft capable of supersonic speed and equipped with "stealth" capabilities that allowed it to evade radar ("the F-35").  The F-35 was developed over multiple years by multiple companies performing contracts with the United States Department of Defense ("defense contractors") in the United States and other countries at a cost of billions of dollars.  Developing and producing the F-35 required the use of those defense contractors' trade secrets and the use of

export-controlled technical data.  Variants of the aircraft were made for different services of different countries' armed forces.

9.    The F-22 "Raptor" was a fifth-generation fighter jet aircraft capable of supersonic speed and equipped with "stealth" capabilities that allowed it to evade radar ("the F-22").  The F-22 was developed over multiple years by defense contractors in the United States at a cost of billions of dollars.  Developing and producing the F-22 required the use of those defense contractors' trade secrets and the use of export-controlled technical data.

10.    In developing, testing, producing, and maintaining the C-17, F-35, F-22, and other military technology, defense contractors generated documents, files, and information, including computer files, that contained trade secrets that were the product of research and development and that were proprietary information belonging to those defense contractors.  Those trade secrets related to various facets of the aircraft, its development, design, testing, production, components, and ongoing maintenance.  Those trade secrets also related to the ways in which those defense contractors competed to win government contracts to build and service military aircraft and other military technology.  Those trade secrets existed in a single document and record at times, and at other times as compilations and collections of documents and files that related to the entire aircraft and to portions or components of the aircraft.

11.    The Arms Export Control Act, Title 22, United States Code, Section 2778 ("AECA"), authorized the President of the United States to control the export of "defense articles" and "technical data" related to such defense articles by designating those items and that

1  data as defense articles and by promulgating regulations for the

2  import and export of such articles and data.

3      12.    Defense articles and technical data subject to such

4  licensing requirements were designated on the United States Munitions

5  List ("USML").  Those designations were made by the United States

6  Department of State ("Department of State") with the concurrence of

7  the United States Department of Defense ("Department of Defense").

8  (22 U.S.C. § 2778(a)(1); 22 C.F.R. § 120.2.)

9      13.    Category VIII of the USML, among others, included aircraft

10  and aircraft-related equipment.  (22 C.F.R. § 121.1.)

11      14.    The AECA and its attendant regulations, the International

12  Traffic in Arms Regulations, Title 22, Code of Federal Regulations,

13  Parts 120-130 ("ITAR"), required a person to apply for and obtain an

14  export license from the Directorate of Defense Trade Controls

15  ("DDTC") of the Department of State before exporting from the United

16  States defense articles or related technical data by any means,

17  including by disclosing technical data on the USML to a foreign

18  person.  (22 U.S.C. § 2778(b)(2); 22 C.F.R. §§ 120.1, 120.10,

19  120.17.)

20      15.    At no time did defendant SU apply for, receive, or possess

21  a license to export defense articles or technical data from the

22  United States.

23      16.    The factual allegations in paragraphs 1 through 15 are

24  incorporated in all counts of this Indictment by reference and are

25  re-alleged as though fully set forth therein.

26      17.    In the course of their conduct, defendant SU, Unindicted

27  Co-conspirator 1, and Unindicted Co-conspirator 2 committed the

28  following acts on or about the following dates:

18.   On October 23, 2008, Unindicted Co-conspirator 1 wrote an e-mail to another person asking:  "Hey there, Do you sell the Poisonivy Program?  How much do you sell it for? i wish to buy one which can not be detect [sic] and killed by the Anti-Virus software."

19.   On July 22, 2009, defendant SU forwarded an e-mail that he had received from Unindicted Co-conspirator 1.  Attached to that e-mail was a draft contract for the purchase of a "System for Unidirectional Secure Delivery of Files Over the Internet," from an identified company located in China that advertised its expertise in the fields of computer network attack and defense and communication security.

20.   On July 23, 2009, defendant SU caused one of his company's employees to e-mail defendant SU and Unindicted Co-conspirator 1 a signed version of the contract described in paragraph 19 that defendant SU had executed on behalf of his company.

21.   On December 14, 2009, defendant SU sent an e-mail to Unindicted Co-conspirator 1 with a subject line of "Target." Attached to the e-mail was a file containing the names and positions of U.S. executives as well as a website and telephone number.

22.   On December 17, 2009, defendant SU sent an e-mail to Unindicted Co-conspirator 1 and copied Unindicted Co-conspirator 2 with a subject line of "RE: Target."  In that e-mail defendant SU identified e-mail addresses, a website, and four individuals associated with a European company.

23.   On January 13, 2010, Unindicted Co-conspirator 1 sent defendant SU an e-mail with a subject line of "C-17," attached a file titled "Desktop 22.rar," and wrote that he would send defendant SU the password for the file.

24. On January 14, 2010, defendant SU sent an e-mail to Unindicted Co-conspirator 1 with a subject line of "RE: C-17," attached a file titled "Desktop 22.rar," and asked Unindicted Co-conspirator 1 to give defendant SU the password for the file.

25. On January 21, 2010, Unindicted Co-conspirator 1 sent defendant SU a file titled "C-17_2.rar" and asked defendant SU to write Unindicted Co-conspirator 1 a document about which files were important, which ones were not important, and what they were.

26. On January 22, 2010, Unindicted Co-conspirator 1 sent an e-mail to defendant SU with a subject line of "Re: C-17 _2," and wrote that 3.txt was the subdirectory and document of 3-jianua.txt, added that some directory trees contained random codes, and reminded defendant SU to read 3.txt.

27. On January 23, 2010, defendant SU sent an e-mail to Unindicted Co-conspirator 1 with a subject line of "RE: C-17 _2," attached a document titled "Appendix 3.rar," and wrote that, judging from its name, the document looked fine.

28. On January 23, 2010, Unindicted Co-conspirator 1 sent an e-mail to defendant SU with a subject line of "Re: C-17 _2," and wrote that 3.txt was the list of documents, added that defendant SU should pay attention to it, and noted that there was some gibberish due to incorrect encoding.

29. On January 25, 2010, defendant SU sent an e-mail to Unindicted Co-conspirator 1 with a subject line of "Re: C-17 _2" and attached a document titled "Appendix-3.docx," which was a list approximately 1,467 pages long of files and folders related to the C-17, with some files and folders highlighted in yellow. In the e-mail defendant SU wrote that the useful ones were marked in yellow and

1   that they should be the computer documents of a person who used an
2   airplane as opposed to a designer.

3       30.   On February 2, 2010, defendant SU sent an e-mail to
4   Unindicted Co-conspirator 1 with a subject line of "Document No. 17,"
5   and defendant SU attached to this e-mail a compressed file, the
6   contents of which included a file with the characters "C-17" in the
7   filename.

8       31.   On February 4, 2010, defendant SU sent Unindicted Co-
9   conspirator 1 an e-mail attaching a file titled "System
10  20100206.rar."  Compressed within the .rar file was a file with the
11  characters "C-17" in the filename.

12      32.   On February 7, 2010, defendant SU sent Unindicted Co-
13  conspirator 1 an e-mail attaching a file titled "20100207.rar."
14  Compressed within the .rar file was a document with the characters
15  "C-17" in the filename.

16      33.   On February 28, 2010, defendant SU sent Unindicted Co-
17  conspirator 1 an e-mail in which defendant SU wrote that the value
18  was decent for a document related to a specific military aircraft,
19  and that it was information needed by an identified state-owned
20  aircraft company in China, but that the company was too stingy.

21      34.   On March 1, 2010, Unindicted Co-conspirator 1 sent
22  defendant SU an e-mail and wrote only "17 keywords" in the body of
23  the e-mail.

24      35.   On March 1, 2010, Unindicted Co-conspirator 1 sent
25  defendant SU an e-mail and wrote "17's LIST. Read Carefully."
26  Unindicted Co-conspirator 1 attached a file to that e-mail titled
27  "17.rar."

28

1    36.  On March 3, 2010, defendant SU sent Unindicted Co-
2  conspirator 1 an e-mail and attached a file titled "17.rar."
3  Compressed within the .rar file were 11 .txt files, whose file names
4  were 17/1.txt through 17/10.txt and an additional file titled
5  17/tools.txt.

6    37.  On March 4, 2010, defendant SU sent Unindicted Co-
7  conspirator 1 an e-mail attaching a file titled "blueprint.rar."

8    38.  On March 7, 2010, Unindicted Co-conspirator 1 sent an e-
9  mail to another co-conspirator attaching several reports about the
10  expenses and activities of certain Chinese entities.  One report
11  described how one of the entities identified targets and sought
12  foreign technologies to advance research and development cost-
13  effectively.

14    39.  On March 19, 2010, Unindicted Co-conspirator 1 sent
15  defendant SU an e-mail with a subject line of "View picture" and
16  wrote in the body of the e-mail "Haha."  Unindicted Co-conspirator 1
17  attached to that e-mail an image of a list of seven filenames that
18  had English characters followed by Chinese characters describing
19  their contents, six of which files contained "c-17" or "c17" in the
20  name of the file.

21    40.  On April 4, 2010, Unindicted Co-conspirator 1 sent
22  defendant SU an e-mail with a subject line of "22" and wrote "22" in
23  the body of the e-mail.  Attached to the e-mail was a document titled
24  "22.rar."

25    41.  On April 4, 2010, defendant SU sent Unindicted Co-
26  conspirator 1 an e-mail with a subject line of "RE: 22."

27    42.  On April 4, 2010, defendant SU sent Unindicted Co-
28  conspirator 1 an e-mail with a subject line of "RE: 22" and

1   instructed Unindicted Co-conspirator 1 to take a look at the file

2   "avel\Training\AVEL Familiarization Course 7-28-08 .ppt."

3       43.   On April 4, 2010, Unindicted Co-conspirator 1 sent

4   defendant SU an e-mail with a subject line of "Re: Reply: 22" and

5   attached an image file named "IMG_0367.JPG."   That image showed a

6   computer monitor displaying a presentation related to training on an

7   F-22 component used in launching missiles, which was marked

8   proprietary and with the warning, "Proprietary Information Source

9   Selection Sensitive.   This Data is Covered by IATR [sic] 22 CFR 120-

10  130."

11      44.   On April 4, 2010, Unindicted Co-conspirator 1 sent

12  defendant SU an e-mail and asked defendant SU about providing a

13  sample of the data they had acquired relating to the C-17.

14      45.   On April 5, 2010, defendant SU sent Unindicted Co-

15  conspirator 1 an e-mail concerning the sale of data and expenses.

16      46.   On April 5, 2010, Unindicted Co-conspirator 1 sent

17  defendant SU an e-mail and wrote that the sample of C-17 data was not

18  intended for sale, but rather for use as a bargaining chip.

19      47.   On August 27, 2010, defendant SU sent Unindicted Co-

20  conspirator 1 an e-mail attaching a .rar file.

21      48.   On October 24, 2010, defendant SU sent Unindicted Co-

22  conspirator 1 an e-mail.   Attached to that e-mail was a .rar file,

23  and compressed within the .rar were five documents containing

24  filenames that corresponded to military and civilian aircraft.   These

25  documents listed some files and folders that were highlighted in

26  yellow.

27      49.   On December 27, 2010, Unindicted Co-conspirator 1 e-mailed

28  to Unindicted Co-conspirator 2 a report that described meeting the

objective of an identified Chinese company to acquire U.S. military technology but sought additional funds to complete the "C-17 Special Project."

50.    On August 11, 2011, Unindicted Co-conspirator 1 sent an e-mail to defendant SU that included a screenshot image of a document and asked defendant SU what the document was.

51.    On November 10, 2011, defendant SU drafted and modified a report that discussed how an identified Chinese entity had acquired research and development information that related to a specific military project that was subject to export restrictions and was restricted by the U.S. Department of Defense, explained why that information was valuable, and sought support to complete its work in acquiring more information.

52.    On November 10, 2011, defendant SU sent an e-mail to Unindicted Co-conspirator 1 and Unindicted Co-conspirator 2. Attached to that e-mail was the report described in paragraph 51.

53.    On December 8, 2011, Unindicted Co-conspirator 2 sent an e-mail to Unindicted Co-conspirator 1 with a list of e-mail addresses, names, and affiliations or roles in U.S. and other governments as well as how the e-mail addresses were compromised.

54.    On February 26, 2012, Unindicted Co-conspirator 1 sent Unindicted Co-conspirator 2 an e-mail attaching a list of thirty-two U.S. military projects and corresponding amounts of data.

55.    On March 23, 2012, defendant SU modified a document related to a flight test plan for the F-35 aircraft with different portions written in English and in Chinese that bore notations that it was proprietary information and subject to export restrictions.

56.  On May 3, 2012, defendant SU sent an e-mail to Unindicted Co-conspirator 1 with a subject line of "Plan."  Attached to that e-mail was the document described in paragraph 55.

57.  On August 6, 2012, Unindicted Co-conspirator 1 drafted and edited a document that described the acquisition of 65 gigabytes of data in 630,000 files and 85,000 file folders that included scans, drawings, and technical details related to the C-17 obtained by gaining access to the Boeing network in January 2010, and noted that the C-17 had been developed at a cost of $3.4 billion in research and development expenses.

58.  On August 13, 2012, Unindicted Co-conspirator 1 sent Unindicted Co-conspirator 2 an e-mail with a subject line of "c17." Attached to that e-mail was the document described in paragraph 57.

59.  On February 21, 2013, Unindicted Co-conspirator 1 sent an e-mail to Unindicted Co-conspirator 2 that attached a report.  The attached report described how the entity with which they were affiliated in China used servers in multiple countries, transferred data to Hong Kong or Macau, and then carried the data to China by hand.  The report described how the entity focused in the United States on military technologies, among other topics, and had acquired data related to the F-35 and C-17.

60.  On May 21, 2014, Unindicted Co-conspirator 1 forwarded an e-mail to a co-conspirator attaching a report describing how a company had been targeted, how its network had been infiltrated, how the computer data stored at the company had been downloaded and transmitted to Macau after going through jumps overseas and before being physically delivered, and how future computer intrusions of the company in a second phase were being designed to address security

1  measures that had prevented acquisition of the information they

2  sought.

1        COUNT ONE

2        [18 U.S.C. §§ 1030(b), (c)(2)(B)(i)-(iii), (c)(3)(A)]

3    A.    OBJECTS OF THE CONSPIRACY

4        61.  Beginning in or about October 2008, and continuing up to

5    and including at least in or about May 2014, in Orange County, within

6    the Central District of California, and elsewhere, including outside

7    the United States, defendant SU BIN, also known as ("aka") "Stephen

8    Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU"),

9    Unindicted Co-conspirator 1, Unindicted Co-conspirator 2, and others

10   known and unknown to the Grand Jury, knowingly combined, conspired,

11   and agreed with each other knowingly and intentionally to commit

12   offenses against the United States, namely:

13        a.   To intentionally access a computer without

14   authorization, and exceed authorized access, and thereby obtain

15   information from a protected computer, as that term is defined at

16   Title 18, United States Code, Section 1030(e)(2), (1) where the

17   offense was committed for purposes of commercial advantage and

18   private financial gain; (2) where the offense was committed in

19   furtherance of a criminal and tortious act in violation of the

20   Constitution and the laws of the United States, specifically,

21   (a) conspiring to export defense articles, in violation of Title 18,

22   United States Code, Section 371, and Title 22, United States Code,

23   Sections 2778(b)(2) and (c), and Title 22, Code of Federal

24   Regulations, Sections 121.1, 123.1, 127.1(a)(1), 127.1(a)(3),

25   127.1(a)(4), 127.1(d), and 127.1(e), as alleged in Count Four of this

26   Indictment; and (b) conspiring to commit theft of trade secrets, in

27   violation of Title 18, United States Code, Section 1832(a)(5), as

28   alleged in Count Five of this Indictment; and (3) where the value of

14

1  the information obtained and sought exceeded $5,000, all in violation

2  of Title 18, United States Code, Sections 1030(a)(2)(C) and

3  (c)(2)(B)(i)-(iii); and

4          b.    To knowingly, and with intent to defraud, access a

5  protected computer, as that term is defined at Title 18, United

6  States Code, Section 1030(e)(2), without authorization, and exceed

7  authorized access, and by means of such conduct further the intended

8  fraud and obtain a thing of value, specifically, information related

9  to military and aviation technology, in violation of Title 18, United

10  States Code, Sections 1030(a)(4) and (c)(3)(A).

11  B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

12        ACCOMPLISHED

13          62.    The objects of the conspiracy were to be accomplished in

14  substance as follows:

15          63.    Defendant SU would e-mail Unindicted Co-Conspirators 1 and

16  2 with guidance on what persons, companies, and technologies to

17  target for unlawful computer intrusions.

18          64.    Unindicted Co-Conspirator 1 would e-mail defendant SU

19  information and files showing defendant SU the information and files

20  to which Unindicted Co-conspirator 1 had gained access through

21  unlawful computer intrusions.  Defendant SU would then provide

22  direction to Unindicted Co-conspirator 1 as to which information and

23  files Unindicted Co-conspirator 1 should steal and obtain via

24  unlawful computer intrusions.  After gaining unauthorized access into

25  various protected computers, Unindicted Co-conspirator 1 would then

26  steal, copy, download, transmit, possess, and send the information

27  and files that defendant SU had directed him to obtain.

28

65.    Defendant SU, Unindicted Co-conspirator 1, and Unindicted Co-conspirator 2 would then write, revise, and circulate reports that described the information they and others had obtained by engaging in such computer hacking, the value of that information, the significance of the information in developing similar technologies, their progress, and their need to continue their computer intrusions.

66.    Defendant SU and Unindicted Co-conspirator 1 would communicate about selling some of the information that they had obtained as a result of their unlawful computer intrusions.

C.    OVERT ACTS

67.    On or about the relevant dates listed herein, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant SU, Unindicted Co-conspirator 1, Unindicted Co-conspirator 2, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere.  These overt acts included sending e-mails, drafting and revising reports and other documents, and other overt acts, including but not limited to the allegations contained in paragraphs 18 through 60 of the Introductory Allegations, which are incorporated herein by reference.

1                              COUNT TWO

2              [18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(i)-(iii);

3                         18 U.S.C. § 2(a)]

4          Between on or about January 1, 2010 and on or about April 30,

5     2010, in Orange County, within the Central District of California,

6     and elsewhere, including outside the United States, defendant SU BIN,

7     also known as ("aka") "Stephen Su," aka "Stephen Subin," aka "Steven

8     Subin" ("defendant SU") intentionally accessed and attempted to

9     access a computer without authorization, and exceeded authorized

10    access, and aided and abetted Unindicted Co-conspirator 1 and other

11    persons known and unknown to the Grand Jury in doing so, and thereby

12    obtained information and attempted to obtain information, including

13    information related to the C-17, from a protected computer, as that

14    term is defined at Title 18, United States Code, Section 1030(e)(2).

15         The offense was committed by defendant SU (1) for purposes of

16    commercial advantage and private financial gain; (2) in furtherance

17    of a criminal and tortious act in violation of the Constitution and

18    the laws of the United States, specifically, (a) conspiring to export

19    defense articles, in violation of Title 18, United States Code,

20    Section 371, and Title 22, United States Code, Sections 2778(b)(2)

21    and (c), and Title 22, Code of Federal Regulations, Sections 121.1,

22    123.1, 127.1(a)(1), 127.1(a)(3), 127.1(a)(4), 127.1(d), and 127.1(e),

23    as alleged in Count Four of this Indictment; and (b) conspiring to

24    commit theft of trade secrets, in violation of Title 18, United

25    States Code, Section 1832(a)(5), as alleged in Count Five of this

26    Indictment; and (3) the value of the information obtained and that

27    defendant SU attempted to obtain exceeded $5,000.

28

1                           COUNT THREE

2          [18 U.S.C. §§ 1030(a)(4), (c)(3)(A); 18 U.S.C. § 2(a)]

3          Between on or about January 1, 2010 and on or about April 30,

4     2010, in Orange County, within the Central District of California,

5     and elsewhere, including outside the United States, defendant SU BIN,

6     also known as ("aka") "Stephen Su," aka "Stephen Subin," aka "Steven

7     Subin" ("defendant SU") knowingly and with intent to defraud accessed

8     and attempted to access a protected computer, as that term is defined

9     at Title 18, United States Code, Section 1030(e)(2), without

10    authorization, and exceeded authorized access, and aided and abetted

11    Unindicted Co-conspirator 1 and other persons known and unknown to

12    the Grand Jury in doing so, and by means of such conduct furthered

13    defendant SU's intended fraud and obtained a thing of value,

14    including specifically information related to military and other

15    technology and including specifically information related to the C-

16    17.

17

18

19

20

21

22

23

24

25

26

27

28

1                          COUNT FOUR

2                        [18 U.S.C. § 371]

3    A.    OBJECT OF THE CONSPIRACY

4          68.    Beginning in or about October 2008, and continuing up to

5    and including at least in or about May 2014, in Orange County, within

6    the Central District of California, and elsewhere, including outside

7    the United States, defendant SU BIN, also known as ("aka") "Stephen

8    Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU"),

9    Unindicted Co-conspirator 1, Unindicted Co-conspirator 2, and others

10   known and unknown to the Grand Jury, knowingly combined, conspired,

11   and agreed with each other knowingly and intentionally to commit an

12   offense against the United States, namely:

13          a.    To willfully export and cause to be exported from the

14   United States items designated as defense articles on the USML,

15   namely technical data, including by means of disclosing such

16   technical data to foreign nationals, without having first obtained

17   from the DDTC the required export license or authorization for such

18   export, in violation of Title 22, United States Code, Sections

19   2778(b) and (c), and Title 22, Code of Federal Regulations, Sections

20   121.1, 123.1, 127.1(a)(1), 127.1(a)(3), 127.1(a)(4), 127.1(d), and

21   127.1(e).

22   B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

23         ACCOMPLISHED

24         69.    The object of the conspiracy was to be accomplished in

25   substance as follows:

26         70.    Defendant SU would e-mail Unindicted Co-Conspirators 1 and

27   2 with guidance on what persons, companies, and technologies to

28

                                    19

1  target in order to obtain export-controlled technical data and other

2  information through unlawful computer intrusions.

3      71.  Unindicted Co-Conspirator 1 would e-mail defendant SU

4  information and files showing defendant SU the export-controlled

5  technical data and other information and files to which Unindicted

6  Co-conspirator 1 had gained access through unlawful computer

7  intrusions.  Defendant SU would then provide direction to Unindicted

8  Co-conspirator 1 as to which information and files Unindicted Co-

9  conspirator 1 should steal and obtain via unlawful computer

10 intrusions.  After gaining unauthorized access into various protected

11 computers, Unindicted Co-conspirator 1 would then steal, copy,

12 download, transmit, possess, and send the information and files that

13 defendant SU had directed him to obtain, without having obtained

14 permission or authorization to export technical data out of the

15 United States or to disclose it to foreign persons.

16     72.  Defendant SU, Unindicted Co-conspirator 1, and Unindicted

17 Co-conspirator 2 would then write, revise, and circulate reports that

18 described the export-controlled technical data and other information

19 they and others had obtained by engaging in such computer hacking,

20 the value of that information, the significance of the information in

21 developing similar technologies, their progress, and their need to

22 continue their computer intrusions.  The reports would also explain

23 that the information was protected by U.S. export restrictions.

24 C.   OVERT ACTS

25     73.  On or about the relevant dates listed herein, in

26 furtherance of the conspiracy and to accomplish the object of the

27 conspiracy, defendant SU, Unindicted Co-conspirator 1, Unindicted Co-

28 conspirator 2, and others known and unknown to the Grand Jury,

committed various overt acts within the Central District of California and elsewhere. Those overt acts included sending e-mails, drafting and revising reports and other documents, and other overt acts, and include, but are not limited to, the allegations contained in paragraphs 29, 39, 41, 42, 43, 49, 51, 52, 55, 56, and 59 of the Introductory Allegations, which are incorporated herein by reference.

COUNT FIVE

[18 U.S.C. § 1832(a)(5)]

A.   OBJECTS OF THE CONSPIRACY

74.   Beginning in or about October 2008, and continuing up to and including at least in or about May 2014, in Orange County, within the Central District of California, and elsewhere, including outside the United States, defendant SU BIN, also known as ("aka") "Stephen Su," aka "Stephen Subin," aka "Steven Subin" ("defendant SU"), Unindicted Co-conspirator 1, Unindicted Co-conspirator 2, and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed with each other knowingly and intentionally to commit offenses against the United States, namely:

a.   To knowingly steal and without authorization appropriate, take, and conceal, and by fraud, artifice, and deception obtain a trade secret that is related to and included in a product that is produced for, used in, and placed in and intended for use in interstate and foreign commerce, with the intent to convert the trade secret to the economic benefit of someone other than the owner of the trade secret, and intending and knowing that doing so would injure any owner of that trade secret, in violation of Title 18, United States Code, Section 1832(a)(1);

b.   To knowingly and without authorization copy, duplicate, photograph, download, upload, replicate, transmit, deliver, send, communicate, and convey a trade secret that is related to and included in a product that is produced for, used in, and placed in and intended for use in interstate and foreign commerce, with the intent to convert the trade secret to the economic benefit of someone other than the owner of the trade secret, and intending

1  and knowing that doing so would injure any owner of that trade

2  secret, in violation of Title 18, United States Code, Section

3  1832(a)(2); and

4        c.   To knowingly receive, buy, and possess a trade secret

5  that is related to and included in a product that is produced for,

6  used in, and placed in and intended for use in interstate and foreign

7  commerce, knowing the same to have been stolen and appropriated,

8  obtained, and converted without authorization, with the intent to

9  convert the trade secret, to the economic benefit of someone other

10 than the owner of the trade secret, and intending and knowing that

11 doing so would injure any owner of that trade secret, in violation of

12 Title 18, United States Code, Section 1832(a)(3).

13 B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

14      ACCOMPLISHED

15      75.   The objects of the conspiracy were to be accomplished in

16 substance as follows:

17      76.   Defendant SU would e-mail Unindicted Co-Conspirators 1 and

18 2 with guidance on what persons, companies, and technologies to

19 target for unlawful computer intrusions in order to obtain trade

20 secrets and other information, intending to convert such trade

21 secrets and other information to the economic benefit of persons and

22 entities other than their owners and intending and knowing that doing

23 so would injure the owners of the trade secrets and other

24 information.

25      77.   Unindicted Co-Conspirator 1 would e-mail defendant SU

26 information and files showing defendant SU the trade secrets and

27 other information and files to which Unindicted Co-conspirator 1 had

28 gained access through unlawful computer intrusions.  Defendant SU

would then provide direction to Unindicted Co-conspirator 1 as to

which information and files, including which trade secrets,

Unindicted Co-conspirator 1 should steal and obtain via unlawful

computer intrusions.  After gaining unauthorized access to various

protected computers, Unindicted Co-conspirator 1 would then steal,

copy, download, transmit, possess, and send the information and

files, including the trade secrets, that defendant SU had directed

him to obtain.  Defendant SU would then receive and possess the

information and files, including the unlawfully obtained trade

secrets, knowing they had been stolen and obtained without

authorization.

78.  Defendant SU, Unindicted Co-conspirator 1, and Unindicted

Co-conspirator 2 would then write, revise, and circulate reports that

described the trade secrets and other information they and others had

obtained by engaging in such computer hacking, the value of that

information, the significance of the information in developing

similar technologies, their progress, and their need to continue

their computer intrusions.

79.  Defendant SU and Unindicted Co-conspirator 1 would

communicate about selling some of the trade secrets and other

information that they had obtained as a result of their unlawful

computer intrusions.

C.    OVERT ACTS

80.  On or about the relevant dates listed herein, in

furtherance of the conspiracy and to accomplish the object of the

conspiracy, defendant SU, Unindicted Co-conspirator 1, Unindicted Co-

conspirator 2, and others known and unknown to the Grand Jury,

committed various overt acts within the Central District of

24

1   California and elsewhere.   Those overt acts included sending e-mails,

2   drafting and revising reports and other documents, and other overt

3   acts, and include, but are not limited to, the allegations contained

4   in paragraphs 19, 33, 42, 43, 44, 45, 46, 48, 51, 52, 55, 56, 57, and

5   58 of the Introductory Allegations, which are incorporated herein by

6   reference.

7

8

9
                                        A TRUE BILL
10

11
                                        _/s/_____
12                                      Foreperson

13   STEPHANIE YONEKURA
     Acting United States Attorney
14

15

16   ROBERT E. DUGDALE
     Assistant United States Attorney
17   Chief, Criminal Division

18   PATRICK R. FITZGERALD
     Assistant United States Attorney
19   Chief, National Security Section

20   ANTHONY J. LEWIS
     Assistant United States Attorney
21   National Security Section

22   AARON LEWIS
     Assistant United States Attorney
23   National Security Section

24

25

26

27

28