EILEEN M. DECKER
United States Attorney
PATRICIA A. DONAHUE
Assistant United States Attorney
Chief, National Security Division
ANTHONY J. LEWIS (Cal. Bar No. 231825)
Assistant United States Attorney
Deputy Chief, Terrorism and Export Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-1786
     Facsimile:  (213) 894-7613
     E-mail:  anthony.lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. SA CR 14-131(C)-CAS |
|---|---|
| Plaintiff, | GOVERNMENT'S REDACTED RESPONSE TO PRE-SENTENCE INVESTIGATION REPORT AND POSITION WITH RESPECT TO SENTENCING OF DEFENDANT SU BIN; REDACTED DECLARATIONS OF COLONEL AMANDA MYERS AND SPECIAL AGENT ROBERT I. KNUFF; EXHIBITS |
| v. | |
| SU BIN, | |
| Defendant. | |
| | Sentencing Date:  July 13, 2016 |
| | Sentencing Time:  2:30 p.m. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Anthony J. Lewis, hereby files the Government's Redacted Response to Pre-Sentence Investigation Report and Position with Respect to Sentencing of Defendant Su Bin and the Redacted Declarations of Colonel Amanda Myers and Special Agent Robert I. Knuff and Exhibits.

The government's sentencing position and response to the Pre-Sentence Investigation Report (the "PSR") is based upon the attached sentencing position and declarations and exhibits, the files and records in this case including the PSR and the affidavit in support of the criminal complaint, and such further evidence and argument as the Court may permit.

Dated:  June 20, 2016                    Respectfully submitted,

                                         EILEEN M. DECKER
                                         United States Attorney

                                         PATRICIA A. DONAHUE
                                         Assistant United States Attorney
                                         Chief, National Security Division


                                              /s/
                                         ANTHONY J. LEWIS
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

TABLE OF AUTHORITIES...............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION................................................1

II.   FACTUAL BACKGROUND..........................................1

      A.   Procedural History.....................................1

      B.   Summary of Offense Conduct.............................2

      C.   Defendant Knew that a Foreign Government, Agent and
           Instrumentality Would Benefit..........................4

           1.   Foreign Government, Instrumentality, and Agent.......5

           2.   The Conspiracy Sought to and Did Misappropriate
                Trade Secrets.....................................11

      D.   Loss Amount...........................................13

           1.   U.S. Air Force's Engineering Costs Associated
                with Selected Files...............................14

           2.   Defendant's Estimate of Gain......................15

           3.   Costs Incurred to Obtain the Stolen Information.....17

      E.   Defendant's Role in the Offense.......................19

III.  GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION..........21

      A.   Sentencing Guidelines Calculation.....................21

      B.   Nature and Circumstances of the Offense...............23

      C.   History and Characteristics of the Defendant..........244

      D.   Seriousness of the Offense, Respect for the Law,
           Adequate Deterrence, and Just Punishment..............24

      E.   Kinds of Sentences Available and Policy Considerations...24

      F.   Need to Avoid Sentencing Disparities..................255

IV.   CONCLUSION................................................25

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

CASES

United States v. Armstead,
        552 F.3d 769 (9th Cir. 2008)..................................13

United States v. Becerril-Lopez,
        541 F.3d 881 (9th Cir. 2008)..................................25

United States v. Berger,
        587 F.3d 1038 (9th Cir. 2009).................................13

United States v. Chung,
        659 F.3d 815 (9th Cir. 2011)..................................13

United States v. Hanjuan Jin,
        733 F.3d 718 (7th Cir. 2013)...................................4

United States v. Jordan,
        256 F.3d 922 (9th Cir. 2001)...................................5

United States v. Rodriguez-Castro,
        641 F.3d 1189 (9th Cir. 2011).................................19

STATUTES

18 U.S.C. § 371...........................................1, 2, 24

18 U.S.C. § 1030(a)(2)(C).................................1, 2, 21

18 U.S.C. § 1832(a)(5)...........................................2

18 U.S.C. § 3553(a)(2)..........................................23

18 U.S.C. § 3585................................................23

22 U.S.C. § 2778.........................................1, 2, 22

OTHER AUTHORITIES

79 Fed. Reg. 44680..............................................9

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Defendant conspired with two military officers in the People's Republic of China to hack into U.S. cleared contractors and steal military technical data.  Defendant first told his co-conspirators whom to target.  Once one of his co-conspirators had hacked into a company, defendant told him which data to steal.  After the data was stolen, defendant evaluated and translated it for the military front company for whom it was taken.  Defendant and his co-conspirators stole data related to multiple military aircraft and projects from companies in the United States and abroad over a period of years.

For his offense, a sentence of fifty-seven months' imprisonment, one year of supervised release, a fine of $100,000, and a $100 mandatory special assessment, is a just punishment for defendant's conviction for violating Title 18, United States Code, Section 371, with the intent to violate both the Computer Fraud and Abuse Act and the Arms Export Control Act.

**II.   FACTUAL BACKGROUND**

**A.   Procedural History**

Defendant was arrested in Canada on June 28, 2014 pursuant to a provisional arrest warrant based on a criminal complaint filed in the Central District of California on June 27, 2014.  (CR 1; PSR ¶ 14.)  Defendant was first indicted on August 14, 2014, while detained in Canada pending extradition, and a Second Superseding Indictment ("SSI") was filed on March 5, 2015 charging defendant with violations of 18 U.S.C. § 1030(a)(2)(C), (a)(4), (b) (Unauthorized Access of Protected Computer and Obtaining Information; Conspiracy), 22 U.S.C. § 2778 (the Arms Export Control

Act), 22 C.F.R. Parts 120-130 (the International Traffic in Arms Regulations or "ITAR"), 18 U.S.C. § 371 (Conspiracy to Violate the Arms Export Control Act and the ITAR), and 18 U.S.C. § 1832(a)(5) (Conspiracy to Commit Theft of Trade Secrets).  (CR 10, 23.)

Defendant waived extradition and first appeared in this Court on February 17, 2016.  (CR 39.)  A First Superseding Information ("FSI") was filed on March 22, 2016, charging defendant with a violation of 18 U.S.C. § 371 for conspiring to violate the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)(2)(C)) and the Arms Export Control Act (22 U.S.C. § 2778(b)(2), (c)) and the ITAR.  (CR 58.)

On March 23, 2016, defendant pled guilty to the First Superseding Information pursuant to a plea agreement.  (CR 64, 65.)

The United States Probation Office ("USPO) disclosed the Pre-Sentence Investigation Report ("PSR") and its recommendation letter (the "USPO Letter") on June 6, 2016.  (CR 68, 69.)  The government agrees with the factual findings of the PSR with some modifications noted below, and agrees with the Guidelines calculations.

**B.    Summary of Offense Conduct**

Defendant is an expert in the field of aerospace, and owns and operates a business that procures and supplies aviation and aerospace technology.  (Plea Agrt. ¶ 12.a; PSR ¶¶ 24, 36.)  Defendant joined others in a conspiracy to hack into the computer networks of companies in the United States in order to steal sensitive and valuable military data, including military data that could not be exported from the United States without an export license.  (Plea Agrt. ¶ 12.c; PSR ¶¶ 25, 27-31.)  As set forth below, those co-conspirators included China's People's Liberation Army Air Force ("PLAAF") officers ███████████, referred to as Unindicted Co-

Conspirator 1 ("UC1") in the SSI and FSI, and ████████, referred to as Unindicted Co-Conspirator 2 ("UC2").  Their conspiracy lasted from October 2008 through May 2014.  (Plea Agrt. ¶ 12.c; PSR ¶ 31.)

While defendant did not personally gain unauthorized access to the victim companies' computers, defendant played an active role in the conspiracy, providing expertise and direction to UC1 and UC2, and analyzing and translating the files they stole.

Defendant told UC1 (who did most of the hacking) and UC2 (who was UC1's superior officer) whom to target.  (Plea Agrt. ¶ 12.k(1)-(2); PSR ¶¶ 27, 40-41.)  Once UC1 had successfully gained access to a company's network, UC1 e-mailed to defendant directory file listings--i.e., lists of files and folders--to which UC1 had gained access.  (Plea Agrt. ¶ 12.e; PSR ¶¶ 28, 32-33.)  UC1 then asked defendant for direction as to which files he should steal, as UC1 did with respect to C-17 files stored at The Boeing Company ("Boeing").  (Plea Agrt. ¶ 12.k(3); PSR ¶¶ 32-33.)  Defendant responded by highlighting the files that UC1 should steal, explaining which files were useful or valuable, or directing UC1 to specific filepaths (the filename and folder location) of files UC1 should steal.  (Plea Agrt. ¶ 12.k(6)-(7), (9); PSR ¶¶ 28, 45, 47, 50; CR 1 pp. 27-29 (highlighting C-17 files), pp. 38-40 (highlighting non-U.S. company's aircraft files).)

Defendant's conspiracy targeted many military aircraft and projects, including the C-17 military cargo aircraft (PSR ¶ 42-49), the F-22 and F-35 fighter jets (Id. ¶¶ 50, 55), and the ████ ████████████████████████████████ ("████," or "Project A" herein and in the Complaint Affidavit, CR 1 at 44-45) (PSR ¶ 51-54), among others.  (PSR ¶ 23.a.)

3

The files defendant and UC1 sought and obtained were subject to the ITAR, and therefore could not have been exported from the United States without a license.  (PSR ¶¶ 34, 50, 55.)  The information defendant and UC1 sought also contained the trade secrets of multiple defense contractors.  (PSR ¶¶ 50 (F-22 information defendant directed UC1 to steal was marked "proprietary"), 55 (F-35 information defendant translated was marked proprietary); see PSR ¶¶ 16-19.)

The conspiracy used sophisticated means, and defendant caused UC1 to use them in carrying out the intrusions and theft--including by using techniques to avoid detection when gaining and maintaining access to victim companies' networks while defendant guided UC1 to the files he should steal.  (Plea Agrt. ¶ 12.e; see Ex. 3 at 55, 56.)

After defendant, UC1, and UC2 stole the data, defendant both translated information that was in English into Chinese, and wrote and revised reports evaluating that information and technology. (Plea Agrt. ¶¶ 12.f-g, 12.k(13); PSR ¶¶ 29, 36.)  As set forth in further detail below, those reports explained the value of the stolen information, and in some instances noted it was controlled for export from the United States.  (Plea Agrt. ¶ 12.g; PSR ¶¶ 29, 37.)

The following Parts set forth the evidence related to the only three sentencing factors as to which the parties did not agree.

**C.    Defendant Knew that a Foreign Government, Agent and Instrumentality Would Benefit**

The facts set forth below pertain to the four-level enhancement under § 2B1.1(b)(13).  The government bears the burden of proving this enhancement by a preponderance of the evidence.  United States v. Hanjuan Jin, 733 F.3d 718, 722 (7th Cir. 2013) (applying enhancement when finding facts by preponderance of the evidence where

defendant was acquitted of economic espionage).  The Court need not find this enhancement by clear and convincing evidence, where it less-than-doubles the sentence, where it is based on defendant's personal knowledge and participation, and where the enhanced sentence is less than the statutory maximum sentence.  United States v. Jordan, 256 F.3d 922, 928 (9th Cir. 2001).  The USPO nonetheless found this enhancement applies by clear and convincing evidence (PSR ¶ 82), and the evidence easily meets that standard as well.

1.   Foreign Government, Instrumentality, and Agent

In truth and in fact, defendant's conduct did benefit a foreign government, instrumentality, and agents.  UC1 and UC2 were military officers, holding the ranks of Professional Technical Major and Lieutenant Colonel, respectively.  (Ex. 4 (reflecting e-mail UC1 sent to himself with his military identification showing his unit and rank); Exs. 5, 6 (showing UC2 in military uniform); PSR ¶ 25.)

UC1 and UC2 were involved in computer intrusions on behalf of the Chinese military.  The reports UC1 sent to UC2 and another associate referred to "espionage work on the US professional network," "Network Reconnaissance," and described how "in order to adapt to the S&T [science and technology] development, our approach to reconnaissance needs an integration of spying methodology and technology."  (Exs. 7 at 74, 8 at 82.)  That second report described the acquisition of "a series of military industrial technology data including F-35, C-17, [Project A, and] ███████████."  (Ex. 8 at 83) (████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  Knuff Decl. ¶ 6.)  Defendant's e-mails with UC1 showing that defendant had been involved in compromising, targeting, or

5

translating stolen information from at least four of those projects: the F-35, C-17, Project A, and ███.  (PSR ¶¶ 50, 55, Ex. 10; CR 1 at 36; Knuff Decl. ¶ 6).

A foreign instrumentality, Qingan Corporation ("QTC"), was also operating on behalf of the Second Department, General Staff Headquarters, Chinese People's Liberation Army ("2PLA") to collect sensitive military technology.  One of the co-conspirator's reports tied together QTC, PLA, and the theft of both C-17 and Project A data.  Specifically, UC1 e-mailed a report to UC2 on December 20, 2012 titled "2011 Work Summary (Report) of the Qing-An Corporation Shenzhen Station of the Intelligence Department of []PLA General Staff Headquarters."  (Ex. 12 at 116.)  It discussed how they had "received full high praise and affirmation from the central committee, military commission and headquarters leaders," and "held 'the Exchange Meeting on Strengthening Special Operations Construction' in Qing-An Corporation Shenzhen workstation, jointly convened by the Second Bureau of the Second General Staff Headquarters of the []PLA, Qing-An Corporation, and the Special Operations Academy."  (Id. at 117.)  It reported they had obtained 260 gigabytes of material related to [Project A] and a "subordinate cooperative company," and "[a]t the same time, we obtained about 60 [gigabytes] massive blueprint materials of the military large-scale transport aircraft C-17 from Boeing."  (Id.)

Defendant deliberately and knowingly joined this Chinese military endeavor to hack into computer networks of U.S. military contractors.  First, from the very nature of the type of sensitive military information that defendant sought and assisted UC1 and UC2 in obtaining, and from their multiple contacts over six years, the

Court can and should find based on that alone that defendant knew that the conspiracy he joined would benefit a foreign government, instrumentality, and agent.  These facts are recounted in detail in the PSR, the Plea Agreement, and the Complaint Affidavit.

Second, there is direct evidence that defendant knew he was benefiting a foreign government, instrumentality, and agent.  The clearest evidence is a series of e-mails in October and November 2011 when defendant prepared a report analyzing a cache of stolen materials he received from UC1 relating to Project A, and defendant addressed his report to the "Second Department, General Staff Headquarters, Chinese People's Liberation Army."  (Plea Agrt. ¶ 12.k(11)-(12); PSR ¶¶ 51-54; Knuff Decl. ¶¶ 5.g-i; Ex. 9-10.)

a.  On October 26, 2011, UC1 sent defendant an e-mail with a link to download an extra-large attachment named Archivereportmaterial.zip.  UC1 wrote in the e-mail "Cellphone number of President ███ ," i.e., the name of UC2.  (Ex. 9 at 87, Knuff Decl. ¶ 5.g.)  On November 1, 2011, defendant forwarded it to his Lode Tech employee, asking him to download the materials.  (Ex. 9 at 86.)

b.  The next day, on November 2, 2011, defendant e-mailed UC1 a version of a report analyzing the Project A materials; the metadata showed someone else created and modified this first version of the document.  (PSR ¶ 51; Knuff Decl. ¶ 5.g.)  Defendant then sent two more versions of the report on November 10, 2011, the first of which showed defendant ("Stephensu") was the last person to modify it, and the second of which showed defendant both created and last-modified the document.  (PSR ¶¶ 53.b-54; Plea Agrt. ¶ 12.k(11)-(12); Knuff Decl. ¶¶ 5.h-i; Ex. 10 at 103.)  It was in the latter two versions of the report, that defendant drafted, where he addressed it

7

to the "Second Department, General Staff Headquarters, Chinese People's Liberation Army."  (Id. at 91)[1]

        c.   This revision history also shows that defendant inserted another change in the versions of the report he drafted: references to Qing'an Corporation.  The report concluded with another reference to 2PLA and "request[ed] that the leadership of the General Staff Headquarters give vigorous support to this special work of the Chinese Aerospace, Science, and Industry Corporation (CASIC), and to urge the Qingan Corporation to complete this task as soon as possible."  (PSR ¶ 53.g; Knuff Decl. ¶¶ 5.h-i; Ex. 10 at 102.)  Most significant, after addressing the report to 2PLA, defendant "acknowledge[d] receiving the [Project A] documents which your department, Qingan Corporation, has transferred over."  (PSR ¶ 53.c; Knuff Decl. ¶¶ 5.h-i; Ex. 10 at 91 (emphasis added).)

    In other words, the fact that defendant addressed the report to 2PLA, and then e-mailed it to UC1 and UC2 (two Chinese military officers) shows that defendant knew they each worked for 2PLA.  That defendant wrote Qingan Corporation into the report and referred to Qingan Corporation as "your department," i.e., 2PLA's department, shows that defendant knew that Qingan Corporation was an instrumentality of the Chinese military, and that it was for QTC that

---

[1] That defendant received an extra-large archive and then drafted a report analyzing the materials related to Project A shows that defendant saw more than metadata and file listings, although he did review file listings as well.  (PSR ¶ 59.)  Similarly, that defendant showed the C-17 documents to people in the industry and confirmed no one had seen them before shows that defendant's role in the conspiracy involved analyzing the contents of the stolen files.  (PSR ¶ 46.)

the stolen Project A materials were being evaluated.[2]  Defendant's inserting QTC into the report as 2PLA's department is corroborated by the evidence above showing that QTC is in fact an instrumentality of the Chinese military and that UC1 and UC2 were engaged in unauthorized computer intrusions under its auspices.

In addition to the explicit references to 2PLA and its QTC company, the language defendant drafted in the report on Project A shows that it is information related to national defense that had been stolen for the benefit of the Chinese military:  "these are the materials that we have fondly dreamed about in our work, and it is our first time having contact with secret data related to the US military's ███" (Ex. 10 at 91); that the documents would "allow us to rapidly catch up with US levels and research and develop better ████████████████" (id.); the information "showed us perfectly the US military's navy, air force, and army's complete coordinated combat thinking" (id. at 92); the information included "the ████████████████████████████████████████████████████████████" (id. at 94); "[t]his set of materials is the highest-level classification we have seen of all the US military materials, and it is extremely valuable" (id. at 91); and that the information "has extremely vital significance in our country's speeding up the development of ████

---

[2]  Qingan Corporation, or Qing'an International Trading Group (QTC) was added to the Department of Commerce, Bureau of Industry and Security's Entity List because it "has been involved in the illicit procurement of commodities and technologies for unauthorized military end use in China."  Addition of Certain Persons to the Entity List, 79 Fed. Reg. 44680, 44681 (Aug. 1, 2014) (including its alias "Qing'an Company Shenzhen Station").  Certain exports to an entity on the list require a license, which licenses are presumptively denied to entities on the list.  See id. at 44680.  Defendant and his company were added to the Entity List at the same time.  Id. at 44681.

████████████████████████████████████ as well as the corresponding construction of a ███████████████████" (id. at 102).   (See PSR ¶¶ 53-54.)

Aside from drafting the report about QTC's work for 2PLA, defendant had stored two contacts in his digital devices for QTC personnel.  (Ex. 11.)  Defendant also saved five different contact entries for UC2[3] in his digital devices, with some referred to as "new" or "special," and one for UC1.  (Ex. 11 at 113.)[4]

Defendant stored another contact for ████████ (Unindicted Co-Conspirator 3, or "UC3") that shows defendant knew he was working with the Chinese military and its instrumentality.  The "Operational Staff" responsible for stealing the C-17 data were listed as UC1, UC2, and UC3 in the report that UC1 sent to UC2.  (Ex. 3 at 54.)  Defendant stored the contact information for UC3 as "Shenzhen ████ ████ (stationmaster)."  (Ex. 11 at 105.)  UC1 had e-mailed two reports to an associate on March 8, 2010 that were each addressed to QTC and discussed creating the Shenzhen "cover company" or "front company" of the Shenzhen station, and that its work involved cyber intelligence collection.  (Ex. 13.b-c.)  Thus defendant knew UC3 (one of the staff who stole C-17 files), and knew he was the stationmaster in Shenzhen station, which was a front company for QTC and 2PLA.

[3] Although defendant claims that his contact with UC1 and UC2 was almost exclusively by e-mail, he stored many phone numbers for UC1.  (PSR ¶ 59.)  Similarly, while defendant stated that he "exchanged several emails" with UC1 and UC2, defendant sent or received at least 146 e-mails with UC1 and UC2 over the several years of their conspiracy, nearly all of them with UC1.

[4] Defendant's address book saved on his digital devices contain dozens of contacts saved with explicit military references, such as:

██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████ (Ex. 11 at 105-113.)

2.   The Conspiracy Sought to and Did Misappropriate Trade Secrets

In addition to evidence showing that defendant intended to benefit a foreign government, instrumentality, and agent, the evidence shows that the sensitive military information he sought to steal and successfully stole included trade secrets.  (E.g., PSR ¶¶ 16-19, 50, 53, 55.)  Further examples include the following:

a.   The Project A reports defendant edited discussed the valuable research and development information that had been acquired--referring to it as "extremely valuable."  (PSR ¶ 52, 53.d.)

b.   On February 2, 2010, defendant sent an e-mail to UC1 attaching a document.  (Ex. 14.)  The metadata shows that defendant wrote the document.  (Id. at 142)  In the attachment, defendant described the attributes of the C-17, estimated the value of several specific types of files, and wrote that "[t]he C-17 aircraft design was completed in 1991, and began outfitting in the Air Force in 1995.  Therefore, documents of the aircraft design phase should all be documents before 1995.  Please have them pay attention to this status."  (Id. at 140; PSR ¶ 46.)  Defendant thus directed UC1 to look for documents before 1995, because those would relate to the aircraft's design, i.e., trade secrets.  Moreover, illustrating that the files defendant and UC1 stole included trade secrets, defendant explained to UC1 that he had "asked people in the industry, nobody has ever seen C-17 documents," and confirmed the "[u]niqueness" of the information.  (Id.; PSR ¶ 75.)

c.   The report describing the theft of the C-17 files (that relied heavily on defendant's direction) noted the C-17 took $3.4 billion dollars in research and development, and described how

11

cost-effective their work had been:  "Experts in China gave a high appraise to our work, saying that it was their first time seeing C-17 documents.  The experts also confirmed the document's value and its uniqueness in China."  (Ex. 3 at 55; id. at 56 (stating "the cost-effectiveness is dramatic").)

d.  In the F-35 Flight Test Plan, referred to in paragraph 12.k.(13) of the Plea Agreement, defendant's translation of a document stated in its header that it was "Proprietary Information," showing that defendant knew the information he stole was proprietary and a trade secret.  (PSR ¶ 55; CR 1 at 47 (displaying "Proprietary Information" and controlled for export in banner at top).)

e.  On April 4, 2010, after UC1 sent defendant materials related to the F-22, and after defendant directed UC1 to a specific file-path, UC1 sent defendant images showing pages from a presentation about a component of the F-22 aircraft.  (E.g., PSR ¶ 50; Plea Agrt. ¶ 12.k(9)-(10); CR 1 at 41-43.)  Those pages contained a banner stating they were "Proprietary."  (PSR ¶ 50 (noting export control warning); CR 1 at 42, ¶ 68.)

f.  Defendant articulated their objectives as taking information that was valuable for purposes of research and development, among the most valuable categories of trade secret information.  In the report defendant drafted about Project A, he explained how valuable the information was and expressed the "hope that they can find more of these kinds of documents, so that it enables us to stand easily on the giant's [the United States'] shoulders in this particular scientific and research work, with endless benefits."  (Ex. 10 at 102; Plea Agrt. ¶ 12.k(11)-(12).)

g.    Showing that the files they stole had value, defendant and UC1 communicated about selling information they obtained through computer intrusions and about the "value" of certain documents, and defendant engaged in the conspiracy for purpose of commercial gain and he sought to profit from selling the data they had stolen.  (Plea Agrt. ¶¶ 12.h, 12.k(7); PSR ¶¶ 30, 38, 47.)

Details of the design process--such as the C-17 design-phase data from the 1990s defendant directed UC1 to steal and that defendant explained in his report about Project A--are squarely included within the meaning of trade secrets.  United States v. Chung, 659 F.3d 815, 827 (9th Cir. 2011) (noting information showed "how Boeing accomplishes its work, including engineering and processing").  These various materials were kept secret and were valuable.  Defendant claimed they were unique and had never been seen before, defendant estimated their value, and they were marked as export-controlled and thus by definition were not publicly available.

**D.    Loss Amount**

There are three separate ways to estimate the loss amount under U.S.S.G. § 2B1.1(b)(1):  the cost of developing a specific set of files that were stolen by defendant and UC1; defendant's own estimate of how much certain files would sell for; and the costs associated with maintaining the computer intrusion operations.  "The court need only make a reasonable estimate of the loss."  Id. § 2B1.1, App. Note 3(C); United States v. Armstead, 552 F.3d 769, 778 (9th Cir. 2008).  Each calculation below results in a loss amount of more than $1.5 million, yielding a sixteen-level enhancement, and does so by clear and convincing evidence, even though the government need only do so by a preponderance of the evidence.  United States v. Berger, 587

13

F.3d 1038, 1040-41, 1047-49 (9th Cir. 2009) (citing cases that affirm up to sixteen-level enhancement using preponderance standard).

### 1. U.S. Air Force's Engineering Costs Associated with Selected Files

The loss amount can be calculated using "the cost of developing" stolen proprietary information.  U.S.S.G. § 2B1.1, App. Note 3(C)(ii); (PSR ¶ 73.ii).  While the conspiracy involved the theft of thousands of files, seven were specifically identified in e-mail communications between defendant and UC1 that related to the C-17, and an estimate of the cost of developing those is $1,875,020.

Defendant and UC1 e-mailed about specific C-17 files that they had stolen that included multiple files in various formats, but seven files in particular appeared in an image that UC1 sent to defendant on March 20, 2010.  (PSR ¶ 48; CR 1 at 31-33.)[5]  UC1's e-mail displayed the characters of original Boeing filenames and were followed by Chinese characters.  (CR 1 at 31-33.)  This shows that the files had been opened and translated to Chinese after they were stolen.  (Id.)

These documents are technical orders, i.e., detailed technical manuals that covered topics such as critical metals and alloys, the operation of the mission computer, maintenance procedures, and a detailed and illustrated list of parts.  (Myers Decl. ¶¶ 7, 14-17.)

Colonel Amanda Myers, System Program Director for the C-17 Globemaster Division, and her staff first determined the number of

---

[5] The PSR indicates these filenames appeared both in this e-mail and in the directory file listing highlighted by defendant that he sent on January 25, 2010.  (PSR ¶¶ 48, 74.b.)  These seven files appeared in the e-mail dated February 2, 2010; they did not, however, appear in the attachment to defendant's January 25, 2010 e-mail, rather they appeared in separate directory file listings attached to an e-mail between defendant and UC1.

14

pages of each technical order.  Next, Col. Myers used the historical average number of engineering hours needed to generate each page of a technical order (4.1 engineering hours per page).  (Id. ¶ 22.)  Then a conservative estimate of $200 per hour of engineering time was used.  (Id.)  That calculation showed the engineering work alone behind these technical orders cost $1,644,920.  Once the engineering work was accomplished, there are separate costs associated with creating the technical order document itself, which for these seven technical orders she estimated amount to $230,100.  These two figures together amount to $1,875,020.[6]

These calculations, however, only account for a handful of the many files that the co-conspirators stole, and only for the C-17.  The co-conspirators claimed to have taken not just these 7 files, but 630,000 files that included drawings, flight test documents, and other materials.  (Ex. 3 at 56.)

> 2.    Defendant's Estimate of Gain

The loss amount can also be calculated using "[t]he fair market value of the property unlawfully taken [or] copied."  U.S.S.G. § 2B1.1, App. Note 3(C)(i); (PSR ¶ 73.i).  The USPO combines this measure of loss with the cost of development discussed above (PSR ¶ 74); the government submits this as a separate, alternative measure of loss, and calculates this measure differently.  (PSR ¶ 73.a.)

---

[6] Col. Myers explains that while there are some limitations on her ability to use this cost model to estimate the cost based on the information available as to these technical orders in 2010, even assuming parameters that would yield the lowest possible costs associated with generating the technical orders, the model she used resulted in an estimated cost of $1,527,200.  (Myers Decl. ¶ 28.)

This figure has also been updated since the PSR was released, and therefore references to $1,905,320 in the PSR (e.g., ¶¶ 49, 74.b, and 75) should be replaced with $1,875,020, and other figures that incorporate it should be adjusted as well (e.g., ¶¶ 74, 76).

First, on January 23, 2010, defendant sent an e-mail to UC1 that attached a numbered list of components such as "Flight Controls," "Hydraulic Power," "Mission Computer," "Electrical Components," and "Tactical Electronic Warfare," some of which were highlighted.  (Ex. 15 at 147.)  At the end of the document, defendant wrote that "these documents all look very good," and that "[t]his is C-17 electronic mission system, electronic war, engine, etc. [i]f the content is very detailed," it would be worth approximately 2,000,000 RMB.  (Id.; PSR ¶ 43.)  Metadata shows defendant wrote the document.  (Ex. 15 at 149.)

Then, on February 2, 2010, defendant sent a document he wrote to UC1.  (PSR ¶ 46; Ex. 14 at 140.)  Defendant wrote:

> After discussion with the general engineer, the value of C-17 data is as follows:
>
> > The value of complete design blueprints should be around 1 million RM[B]
> >
> > The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is willing to pay 500K RMB for documents of the testing category
> >
> > The complete use manual get 500K RMB
> >
> > The value of the F-117 engine complete document is fairly big, engine is the major problem of domestic programs
> >
> > The value of complete use document, breakdown reports should be able to get 500K also
> >
> > The value of electronic system documents is far less than F-35
> >
> > The value of the aircraft landing gear, increase ascension system, and structure is high.
>
> Uniqueness of the document, (I've) asked people in the industry, nobody has ever seen C-17 documents.
>
> Workflow is as follows:  still take the catalog first, take samples, and then go to the system to look for the general engineer to negotiate the value, bid must be for the whole!!!  This is a relatively safe way.

(Id.)[7]  The C-17 uses the F-117 engine.  (Myers Decl. ¶ 3.)

Those amounts (1M + 500K + 500K + 500K) total 2.5 million RMB. When combined with the 2 million RMB in paragraph 1, that amounts to 4.5 million RMB.  The conversion rate on February 2, 2010 was approximately 6.828100 RMB to 1 USD, and 4.5 million RMB converts to $659,041.31.  Assuming each of the additional components referred to as having high value--the F-117 engine and the C-17 aircraft landing, increase ascension system, and structure--were at least as valuable as 1,000,000 RMB (the value of higher-valued items defendant listed), then an additional 2,000,000 RMB would yield an additional $292,907.25, which totals $951,948.56.

These figures did not include the F-22 files, the F-35 flight test plan, materials related to Project A, or other projects.  Thus a conservative calculation of doubling defendant's estimated value of particular parts of the C-17 in January and February 2, 2010, $951,948.56, which was early in the conspiracy and was focused primarily on C-17 information, yields a loss amount of $1,915,897.12.

3.    Costs Incurred to Obtain the Stolen Information

Separate from the costs of preparing the technical orders, and separate from the price that defendant expected the stolen files to fetch, a proxy for the value of the stolen materials is the costs associated with stealing them.

UC1 sent a report on March 8, 2010 that contained detailed information about the costs associated with operating that

---

[7] The USPO notes that the several dozen subjects listed in the attachment to defendant's January 23, 2010 e-mail are the same as those listed in defendant's February 2, 2010 e-mail.  (PSR ¶¶ 43, 45, n.14.)  Defendant, however, refers to different components in each of these two documents.

conspiracy. Attached to UC1's e-mail were a series of numbered "Intelligence Notes" dated on or about August 10, 2009, each of which were addressed to QTC, many of which itemized the expenses necessary to carry on their espionage operations. For example:

a. Intelligence Note number 1 discussed costs associated with developing locations overseas and it itemized expenses for September 2009 to September 2010. Some of the expenses were "One-time Expenditures on Hardware" totaling 1,207,000 RMB that included servers, routers, and network storage equipment; other "Yearly Fixed Expenditure[s]" that totaled 1,561,000 RMB included leases, cable rental lines with sufficient bandwidth, and domain name rentals. (Ex. 13.a at 123-125.) These expenses totaled 2,768,000 RMB.

b. Intelligence Note number 3 discussed the creation of a "Cover Company" that required 20 people, requested a "One-time Fixed Expenditure" of 2.78 million RMB for office building renovation, fixed assets, and office facilities, and requested a "Yearly Fixed Expenditure" of 3.965 RMB, totaling 6,751,800 RMB. (Ex. 13.b at 128-129.) An attachment detailed expenses for rent, broadband Internet, office equipment, salary, travel, vehicles, and other equipment. (Id.)

c. Intelligence Note number 10 discussed "Collection Equipment" and called for: a remote scanning system; a "Mail Detection and Searching Platform"; "Internet Explore [sic] Exploit"; "Yahoo XSS/COOKIS [sic] Exploit"; "Hotmail XSS Exploit"; "RPC Remote Exploit"; "Apache Remote Exploit"; "MS OFFICE EXCEL Exploit"; "MS OFFICE WORD Exploit"; MS OFFICE PPT Exploit"; "Adobe PDF Reader Exploit"; and other "exploits." (Ex. 13.d at 135-136.) These

planned expenditures were for the period of September 2009 to September 2010 and totaled 1,190,000 RMB.  (Id.)

Thus:  2,768,000 RMB (Intelligence Note 1) + 6,751,800 RMB (Intelligence Note 3) + 1,190,000 RMB (Intelligence Note 10) = 10,709,800 RMB.  With the conversion rate of 6.835270 RMB/USD on August 10, 2009, this yields $1,566,843.74.[8]

As with the other amounts above, this is a conservative estimate.  These are the costs only associated with fixed and recurring costs in 2009, while defendant's conspiracy extended through 2014.  (Plea Agrt. ¶ 12.c).  While defendant may not have been privy to each of these ledgers, it is only logical that these costs were comparable to the fruits that defendant and his co-conspirators expected them to bear.

Finally, and significantly, none of these metrics account for other harms defendant explicitly intended.  As noted above, defendant analyzed Project A materials to explain how they would benefit developing countermeasures against U.S. defense technologies.

**E.    Defendant's Role in the Offense**

The facts set forth in this Part pertain to defendant's role in the offense, and show why defendant is not entitled to an adjustment for a minor role pursuant to § 3B1.2.  "[I]t is well established that '[t]he defendant bears the burden of proving that he is entitled to a downward adjustment based on his role in the offense.'"  United States v. Rodriguez-Castro, 641 F.3d 1189, 1193 (9th Cir. 2011).

_____

[8]    This conversion rate is based on publicly available resources.  Other Intelligence Notes attached to UC1's March 8, 2010 e-mail contained other expenses, they were specifically attributable to performing reconnaissance on other targets in other countries and are excluded from these calculations.

19

Defendant's role was by no means minor or mitigating in the conspiracy to which he pled guilty.  Defendant was of vital importance.  Defendant sent UC1 e-mails with a subject line of "Target" identifying persons and companies, "directed [UC1] as to which files and folders [UC1] should steal" after UC1 gained access to them, and "wrote, revised, and e-mailed . . . reports about the information and technology they had acquired by the hacking," which reports "explained the value of the information."  (Plea Agrt. ¶ 12.e, 12.g, 12.k(1)-(2).)  As the PSR accurately reports, defendant was needed to navigate which files to steal, his training and knowledge was used to assign dollar values to the stolen data, and defendant translated key documents.  (PSR ¶ 88; see id. ¶ 124.) Other examples of defendant's central and pivotal role in the conspiracy include:

a.    In an e-mail dated October 22, 2012, UC1 referred to defendant as "BOSS SU."  (Knuff Decl. ¶ 5.n.)

b.    On January 21, 2010, UC1 sent an e-mail to defendant attaching a long list of files and asking defendant to "[p]lease write me a document about which ones are important, which ones are not important and what they are."  (Plea Agrt. ¶ 12.k.3.)

c.    On April 4, 2010, after UC1 sent defendant materials related to the F-22, defendant directed UC1 to a specific file about an F-22 component.  (Id. ¶ 12.k(9)-(10); PSR ¶ 50; CR 1 at 41-43.)

d.    On October 24, 2010, defendant also highlighted the files he received from UC1 that related to a military cargo aircraft that was similar to and a competitor with the C-17.  (CR 1 at 37-40.)

e.    Defendant not only guided and directed UC1 as to which files to steal, but he consulted with experts on the set of stolen

20

information, which conclusions made their way into the report UC1 sent.  (Compare Ex. 14 (Defendant wrote to UC1:  "Uniqueness of the document, (I've) asked people in the industry, nobody has ever seen C-17 documents") with Ex. 3 (UC1 wrote to UC2:  "Experts inside China have a high opinion of them, expressing that the C-17 data were the first ever seen in the country and confirming the documents' value and their unique nature in China.").)

**III. GOVERNMENT'S SENTENCING POSITION AND RECOMMENDATION**

### A.    Sentencing Guidelines Calculation

Because defendant pled guilty to a conspiracy, the parties agree that U.S.S.G. § 2X1.1 is the governing Guideline, and pursuant to § 2X1.1(a), the offense level is the offense level of the substantive crime that was the object of the offense.  (Id. ¶ 14.a.) The conspiracy to which defendant pled guilty has two substantive offenses as its objects, and there are therefore two separate Guidelines calculations.  (Id.); U.S.S.G. § 3D1.2, cmt. 8.

There are only three disputed factors at sentencing:  whether defendant knew or intended a foreign government, instrumentality, or agent would benefit from the misappropriation of trade secrets; the loss amount; and whether defendant is entitled to a minor role. (Plea Agrt. ¶¶ 15.a-b, 16; id. ¶¶ 14.b-c.)  These are each addressed in Parts II.C-E above.  With minor modifications on how it arrived there, the government agrees with the offense level of 25 computed by the USPO (PSR ¶ 83).

The Guidelines yield a total offense level of 25 under the first object of the conspiracy, violating the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)(2)(C) and (c)(2)(B)(i)):

- a base offense level of 6 (§ 2B1.1(a)(2)); (**Agreed**: Plea Agrt. ¶ 14.b)

- a +16 enhancement from a loss amount above $1,500,000 (§ 2B1.1(b)(1)(I) (**Disputed**: PSR ¶ 76; Part II.D supra);

- a +2 enhancement for using sophisticated means (§ 2B1.1(b)(10)(C)) (**Agreed**: PSR ¶ 77, Plea Agrt. ¶ 14.b);[9]

- a +4 for the offense involving misappropriation of a trade secret and defendant knowing or intending that the offense would benefit a foreign government, foreign instrumentality, or foreign agent (§ 2B1.1(b)(13)(B)) (**Disputed**: PSR ¶ 82; Part II.C supra); and

- a -3 adjustment for acceptance of responsibility (§ 3E1.1) (**Agreed**: Plea Agrt. ¶ 3.e).

The Guidelines yield a total offense level of 23 under the second object of the conspiracy, violating the Arms Export Control Act (22 U.S.C. § 2778(b)(2), (c)):

- a base offense level of 26 (§ 2M5.2(a)(1)) (**Agreed**: Plea Agrt. ¶ 14.c);

- a -3 adjustment for acceptance of responsibility (§ 3E1.1) (**Agreed**: Plea Agrt. ¶ 3.e).

---

[9] The USPO recommended applying the enhancement under U.S.S.G. § 2B1.1(b)(10)(B) because the offense occurred outside the United States. (PSR ¶ 77.) While that enhancement yields the same result, the parties have agreed that the enhancement pursuant to §2B1.1(b)(10)(C) applies in this case. Defendant guided UC1 while UC1 was carrying on his hacking into defense contractors, which necessarily involved using sophisticated techniques to avoid detection as UC1 described in his report, and thus defendant caused the use of those techniques in the course of the conspiracy and the government recommends the Court apply the sophisticated means enhancement. (Plea Agrt. ¶ 14; Ex. 3 at 55-56.)

Because the parties agree that the two objects of the offense group, and that whichever object carries a higher offense level will be the offense level for the conspiracy, the total offense level for the conspiracy is therefore 25 (the first object), which is the maximum level that the parties agreed could result from the plea agreement.  (Plea Agrt. ¶ 17; PSR ¶¶ 65-66); U.S.S.G. § 3D1.2(a), (b) & cmt. 8.

With a criminal history category of Category I (PSR ¶ 100), the Guidelines yield an advisory range of 57-71 months.

The government recommends the low end of the advisory guidelines range (as it agreed to do, Plea Agrt. ¶ 3.f), a term of imprisonment of fifty-seven months, one year of supervised release with the terms recommended by the USPO, a fine of $100,000, and a $100 mandatory special assessment.  This sentence is sufficient, but not greater than necessary, to address the factors set forth in 18 U.S.C. § 3553(a)(2), which are addressed below.  The government further recommends that the Court recommend to the Bureau of Prisons that, in calculating defendant's serving of the sentence imposed by the Court, defendant be given credit for the time he has been detained in Canada, consistent with 18 U.S.C. § 3585.

**B.    Nature and Circumstances of the Offense**

The nature and circumstances of the offense are detailed at length above, and warrant the recommended sentence.  Defendant's own words reflect his intent in compromising valuable and sensitive military data on behalf of a foreign military, and he did so for profit while undermining the national security of the United States.

23

**C.    History and Characteristics of the Defendant**

Defendant is a trained engineer, an expert in the field of aviation, and a businessman.  He applied these skills to focus, direct, and advance the computer intrusions of his military co-conspirators.  Defendant's history and characteristics show that his conduct here was the result of his deliberate action and choices to aid his co-conspirators in their unauthorized computer intrusions.

**D.    Seriousness of the Offense, Respect for the Law, Adequate Deterrence, and Just Punishment**

A significant term of imprisonment is necessary to promote respect for the law, and to deter both defendant and others. Defendant aided UC1's hacking into U.S. companies while defendant meanwhile traveled in and out of the United States.  Similar offenses by trained and well-resourced hackers and their associates can be difficult to detect and fully investigate, and a significant sentence is both warranted and necessary to effectively dissuade others.  The recommended sentence is both just and commensurate with defendant's conduct, and it will deter others who may contemplate doing the same.

**E.    Kinds of Sentences Available and Policy Considerations**

For the single count of conviction for violating 18 U.S.C. § 371, defendant may be sentenced to up to five years in prison.  A sentence of nearly that length--fifty-seven months--is warranted here, where defendant's conviction bears multiple aggravating factors, embraces multiple objects, and by defendant's own words undermined the national security of the United States.

While the Court may fine defendant up to $250,000, a fine of $100,000 is conservative, and takes into account both aggravating and mitigating factors--that defendant had been his family's primary

24

source of income, but that defendant sought to steal materials worth far more than $100,000, by his own estimate.

### F.    Need to Avoid Sentencing Disparities

A sentence of imprisonment of fifty-seven months is, taking into account the other factors and considerations set forth herein, likely to avoid a disparity with other cases nationwide, particularly where the total offense level is 25 and fifty-seven months' imprisonment is the low end of the resulting advisory Guidelines range. See United States v. Becerril-Lopez, 541 F.3d 881, 895 (9th Cir. 2008) (observing that sentences within the Guidelines range are unlikely to create a disparity because "it represents the sentence that most similarly situated defendants are likely to receive").

### IV.    CONCLUSION

For the foregoing reasons, the government respectfully submits that an appropriate sentence for defendant is fifty-seven months' imprisonment, one year of supervised release with the terms recommended by the USPO, a fine of $100,000, and a $100 mandatory special assessment.

<u>EXHIBIT LIST</u>

<u>Exhibits to Declaration of Colonel Amanda Myers</u>

1.   Engineering Cost Model:  2016

2.   Engineering Cost Model:  2010

<u>Exhibits to Declaration of Special Agent Robert I. Knuff</u>

3.   August 13, 2012 E-mail and Attached Report Titled "Work Summary on Intelligence Collection on C-17 Project (Report)"

4.   October 30, 2012 E-mail and Attached picture of UC1's Chinese military identification card

5.   March 19, 2012 E-mail and Attached picture of UC2's Hong Kong Identity Card

6.   June 28, 2012 E-mail and Attached picture of UC2 in military uniform

7.   Sept. 29, 2010 E-mail and Attached Report Titled "Elementary analysis on espionage work on the US professional network"

8.   Feb. 21, 2013 E-mail and Attached Report Titled "Briefing on Network Reconnaissance"

9.   Oct. 26, 2011 E-mail from Defendant to his Employee

10.   Nov. 10, 2011 E-mail from Defendant to UC1 and UC2 Attaching Report Regarding Project A and its Metadata

11.   Translations of Selected Contacts Found on Defendant's Digital Devices

12.   Dec. 20, 2012 E-mail from UC1 to UC2 and Attached Report Titled "2011 Work Summary (Report) of the Qing-An Corporation Shenzhen Station of the Intelligence Department of CCPLA General Staff Headquarters"

13.   Mar. 8, 2010 E-mail from UC1 to ███████ Attaching:

    a.    Intelligence Note Number 1, Titled "Table of Overseas Locations Development Plan"

    b.    Intelligence Note Number 3, Titled "Report on Establishment of the Shenzhen XXX Cover Company" and Budget Expenditure Table

    c.    Intelligence Note Number 4, Titled "Shenzhen XXX Corporation Staffing and Organizational Structure"

    d.    Intelligence Note Number 10, Titled "Collection Equipment Plan Chart"

14. Feb. 2, 2010 E-mail from Defendant to UC1 Attaching Document Discussing C-17 and its Metadata

15. Jan. 23, 2010 E-mail from Defendant to UC1 Attaching Document Discussing C-17 and its Metadata

027

<u>DECLARATION OF AMANDA MYERS</u>

I, Colonel Amanda Myers, declare as follows:

1.    I am currently the System Program Director for the C-17 Globemaster Division at Robins Air Force Base and a Colonel in the United States Air Force.  I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2.    I have been the System Program Director for the C-17 since July 2014.  Previously I was the System Program Manager for the T-38 supersonic jet trainer at Hill Air Force Base, Utah from 2010 to 2013.  I received a master's degree in strategic studies from the United States Army War College in 2014, a master's degree in military operational art & science from Air War College in 2006, a master's degree in aeronautical science technology from Embry-Riddle Aeronautical University-Worldwide in 1996, and a bachelor's of science degree in aerospace engineering from Auburn University in 1992.

3.    The C-17 Globemaster is a military cargo airlift.  The C-17 is capable of carrying large combat equipment, troops, or humanitarian aid, it has a range of 2,400 nautical miles and is capable of being refueled in flight, it is powered by four F-117 engines, and it can land on or take off from short airfields.  While production of new C-17 aircraft has been discontinued, the C-17 aircraft continues to be used operationally by the United States and some foreign countries.  It was developed, produced, and modernized by The Boeing Company ("Boeing") over a period of decades pursuant to multiple contracts with the Air Force at a total cost of billions of dollars.

4.    As the System Program Director for the C-17 Globemaster, I am responsible for the Operational Safety Suitability and Effectiveness of the weapon system and for Life Cycle Management.  In general that means I am accountable for the implementation, management, and oversight of all activities associated with the development, production, sustainment, and disposal of the C-17 aircraft across its life-cycle.

5.    The C-17 Globemaster Division is divided into multiple branches that I supervise.  Those include the Capabilities Branch, the Product Operations Branch, the Product Support Branch, the Foreign Military Sales Branch, Engineering, Finance, and the Maintenance and Modifications Branch.  Within the Maintenance and Modifications Branch is the Technical Order Management Agency ("TOMA").  The TOMA is responsible for controlling the accuracy of Technical Orders for the C-17.

6.    In performing my duties and in preparing this declaration, I have worked closely with the Chief Engineer, the chief technical authority, who in turn supervises other lead engineers, engineering supervisors and other systems engineers.  The Chief Engineer leads the implementation of the program's systems engineering processes and ensures their integrity, including technical risk assessment.  I lead the C-17 Technical Order Management Agency as well as the program manager for the current C-17 contract, and have consulted with them in connection with preparing this declaration.

**A.    Engineering Necessary for C-17 Technical Orders**

7.    Technical Orders provide the means of disseminating technical data to Air Force personnel, equipment operators, maintainers, trainers, engineers, and other personnel that need

2

technical data related to the C-17.  Technical Orders are not unique to the C-17, rather they are created and used for many forms of military technology, ranging from aircraft and spacecraft to ships to tanks and artillery.  Technical orders can contain different types of information, and provide the people using or maintaining certain technology--here, the C-17--information they need to perform their role.  Technical orders can contain what are in essence a detailed instruction manual for operating or maintaining certain technology, or they can contain information about the raw materials needed for certain equipment to be manufactured, or a range of other forms of technical information that need to get to the personnel using that technology.

8.    The Air Force uses a system for Technical Orders in order to maintain and deliver instructions for the safe and effective operation and maintenance of Air Force military systems and end items.  (An "end item" is a completed project with all its component parts, such as a ship, tank, or aircraft.)  The Air Force Technical Order system is established and governed by explicit Air Force policies, specifically Air Force Policy Directive (AFPD) 63-1/20-1, Integrated Life Cycle Management and Air Force Instruction (AFI) 63-101/20-101, Integrated Life Cycle Management.

9.    The cost of acquiring technical orders includes engineering labor, writing, editing, supporting conferences and reviews, verification, preparation of master copy/PDFs, printing and distribution, routine maintenance, and technical order-related travel.  How the costs associated with a Technical Order are accounted for can vary depending on the type of contract.  For example, when a weapon system (a generic term that includes Air Force

3

aircraft platforms) is first being created, technical order costs are chargeable to the same budget program activity code used to finance hardware costs during initial acquisition.  In that case, the Technical Order Manager must begin estimating the cost of preparing technical orders shortly after assignment to ensure adequate program funds are available to generate the necessary Technical Orders.  The costs of creating Technical Orders are thus an integral part of contracts awarded by the Air Force that are incorporated directly into the program's budget and control, but they are not always individually itemized.

10.   The C-17 has already been designed and is no longer being produced.  The C-17 is currently being sustained under a contract titled the Globemaster Integrated Sustainment Program ("GISP").  All costs are accounted for under particular contract line items, each of which is supported by one or more "basis of estimate" ("BOE") by the contracting party, here, Boeing, that include a methodology for calculating the associated costs.

11.   For purposes of calculating the cost of engineering labor associated with creating or modifying Technical Orders in the sustainment phase, that labor cost would be accounted for under an engineering line item with an accompanying basis of estimate.  Using the version of the operative contract in place in 2010, Boeing had

in its BOE.  That rate was for direct labor hours, and did not account for any margin of profit for Boeing nor for various increases that routinely are charged on top of a direct hourly rate, for example, overtime pay, holiday pay, travel, or other

031

direct expenses that cause an hour of an engineer's time to ultimately result in a charge that is higher than ████. Based on these common, additional expenses, my staff and I have determined that a conservative estimate for average hourly labor is $200 per hour of engineering labor.

12. As the C-17 contractor, Boeing continues to author, create, edit, and sustain the C-17 Technical Orders. The costs associated with creating or modifying Technical Orders are charged to the Air Force. As a Technical Order is being created or modified, once the data is approved and becomes available for publishing to those who require it for purposes of maintaining or sustaining the C-17 fleet, the C-17 TOMA will upload to an Air Force-approved system called the Enhanced Technical Information Management System ("ETIMS"). ETIMS serves as a database that maintains current and certain historical records of technical orders and other information related to various Air Force projects.

**B.    Specific Technical Orders Evaluated**

13. I have received a list of files from Special Agents Robert I. Knuff of the Federal Bureau of Investigation and from Special Agent Jonathan Drapalik of the United States Air Force Office of Special Investigations. Using that list, at their request I have retrieved the versions of each of the documents that were current from 2010 when available as well as the documents that are currently available in 2016 from ETIMS. The following C-17 technical orders were identified and analyzed to determine the costs associated with the underlying engineering labor as well as the cost of creating the technical order documents based upon that engineering work. The technical orders are categorized as follows:

5

032

**General Reference Manual:**

  A. Technical Order:  00-25-113-C17 - Critical Alloys and Precious Metals

14.  This technical order, Critical Alloys and Precious Metals Parts List, provides a list of parts and components that contain alloys that are considered critical or precious.  This manual is used in conjunction with Technical Order 00-25-113, Critical Alloys and Precious Metals List, and aids in the identification and possible segregation of condemned parts containing critical alloys and precious metals.

**Flight Manuals:**

  B. Technical Order:  1C-17A-1-2 - Mission Computer

15.  This technical order contains the necessary information and procedures for the safe and efficient operation of the C-17A aircraft.  The manual provides general information about the aircraft and its characteristics, specific normal and emergency operating procedures, a description and theory of operation, malfunction analysis, and alternate procedures.

**Job Guide, Organizational Maintenance:**

  C. Technical Order:  1C-17A-2-12JG-24-1 - Servicing Electrical Power

  D. Technical Order:  1C-17A-2-12JG-29-4 - Servicing Hydraulic Power

  E. Technical Order:  1C-17A-2-47JG-20-1 - Onboard Inert Gas Generation System Distribution and Control

16.  These technical orders provide step-by-step procedures to repair failed components and return the aircraft to service.  The first includes maintenance procedures for integrated drive generator

6

033

oil servicing and flushing, and procedures to disconnect and connect the main battery.  The second includes maintenance procedures for the servicing, bleed, and draining of hydraulic system reservoirs.  The third includes maintenance procedures for the operational checkout, removal, and installation of the distribution and control system components.

**Illustrated Parts Breakdown**:

F.    Technical Order:  1C-17A-4-56 – Illustrated Parts Breakdown Organizational Maintenance Windows

17.  This manual corresponds to the aircraft system used for organizational level ("O" level) support of the aircraft.  It contains detailed illustrations for the assemblies, subassemblies, and details parts of the C-17 aircraft and the support equipment for the aircraft.  It also contains a Maintenance Parts List applicable to requisition and replacement of spare parts.  Information in these manuals enable the technician to correctly identify part location, part number, and the intended disposition of the part, i.e., the intended location and purpose or function of the part within the entire system.

**Intermediate Maintenance Instruction:**

G.    Technical Order:  33D7-50-1592-1 – Fuel Quantity Computer Interface Adapter Part Number 17G460502-503

18.  This technical order provides detailed procedures in a step-by-step form to accomplish specific maintenance tasks related to the Fuel Quantity Computer Interface Adapter.  The number I was provided by Special Agents Knuff and Drapalik was 33D7-50-1592-2. That Technical Order number could not be located in ETIMS, but I have reviewed a copy of the Technical Order bearing this number that was

7

last revised on September 1, 2003, provided to me by Special Agents Knuff and Drapalik that they received from Boeing. (That document resembles the Technical Order 33D7-50-1592-1, which is stored in ETIMS and appears to be identical and has the same number of pages; these two numbered orders addressing the same topic may be a function of the Technical Order having been re-published for various reasons.)

### C.    Cost Model Used to Assess C-17 Technical Orders

19. The model described herein used to estimate the engineering costs was composed of two components:  First, the labor required to perform the necessary engineering work, and second, the labor needed to generate the technical order document based upon that engineering work.  Inasmuch as the technical orders contain detailed information needed to operate complex technology, the primary cost associated with a technical order is the labor needed to ensure that sound engineering supports the instructions and details in the Technical Orders.  The second component of the cost associated with a Technical Order is the cost of creating a written document that embodies that engineering work--essentially the labor cost associated with "putting pen to paper" and drafting and illustrating each page of the Technical Order and ensuring its accuracy.

20. Attached hereto as Exhibit 1 and 2 are two spreadsheets, each containing the analysis used to estimate the cost in labor to generate the technical orders identified above for the years 2016 and 2010, respectively.[1]

---

[1]    Each of these Exhibits contain multiple columns that are a part of a detailed cost analysis that my staff and I have prepared. For purposes of presentation, only some of those columns are included in the versions of those spreadsheets attached hereto as exhibits.

8

### 1.    Engineering Cost Model:   2016 (Exhibit 1)

21.   The calculations for this cost model using the information available about these seven Technical Orders in the year 2016 are detailed in Exhibit 1, attached hereto.

22.   In order to estimate the engineering labor the following parameters were used.  First, the number of pages of each technical order was determined by consulting ETIMS.  (Column F.).  Second, the number of pages was multiplied by the historical average of 4.1 hours of engineering labor per page.  That figure was obtained from a historical "Basis of Estimate" document provided by Boeing in contract proposals for the C-17.  The resulting figure would equal the total number of engineering hours estimated to be required for the given technical order.  (Column Y.)  Finally, the result of the previous calculation was multiplied by $200, the commercial standard rates of engineering labor discussed above in paragraph 11.  The result of that calculation yielded the engineering cost for each technical order.  (Column Z.)  These engineering costs total $1,644,920.  (Column Z, Totals.)

23.   The second component is differentiated into pages containing text versus pages containing illustrations.  For pages of C-17 technical orders containing text, the average cost of preparing a page was $100 per page.  For pages of C-17 technical orders containing illustrations, the average cost of preparing a page was $150 per page.  These rates were estimated based on the TOMA's experience in preparing Technical Orders and on the Technical Order Manager's discussions with other Air Force Technical Order Managers. Thus, for each technical order, the number of pages of text (Column O) was multiplied by $100 (to yield Column R), and the number of

9

pages containing illustrations (Column P) was multiplied by $150 (to yield Column S), and those two results were summed to yield the cost of preparing each technical order (Column T).  These costs of creating the technical orders total $230,100.  (Column T, Totals.)

24.  Thus the combined total of the engineering costs ($1,644,920) plus the cost of creating the technical order ($230,100) amount to $1,875,020.  (Column AB, Totals.)

2.   Engineering Cost Model:  2010 (Exhibit 2)

25.  I have also attempted to perform these calculations using the same engineering cost model for the data available in 2010; those calculations, however, could not be performed precisely the same way because the historical 2010 information for the number of pages in each technical order that contained text versus the number of pages that contain illustrations is not available due to updates made to the technical orders.  (One of the filenames, 33D7-50-1592-1, was not present in the ETIMS system for 2010, but as noted above, the similarly-named file 33D7-50-1592-2 was received from Boeing directly and was examined for purposes of calculating this cost estimate.) The calculations for the cost model using the information available about these seven Technical Orders in the year 2010--with those limitations--are detailed in Exhibit 2, attached hereto.

26.  If those calculations were performed without including any information for technical order 33D7-50-1592-1, the first component of engineering costs is $1,361,200.  (Column Z, Totals.)

27.  The remaining technical orders contain 1,660 pages. (Column F, Totals.)  If the remaining technical orders were assumed to all contain text pages (which are less expensive to create at $100 per page, versus $150 per page of illustration), the second

10

component--the costs associated with creating the technical orders-- is $166,000.  (Column T, Totals.)

28.  Thus, even without the costs associated with one of the technical orders, and even assuming that all of the pages were the less-expensive text pages, the combined total of the engineering costs ($1,361,200) plus the cost of creating the technical order ($166,000) amount to $1,527,200. (Column AB, Totals.)

        3.    Confidentiality

29.  As noted above, details such as the parameters used to prepare this analysis are drawn from the rates that were submitted by Boeing in connection with bidding for and winning contracts with the Air Force.  I understand those rates are confidential and as such they should not be disclosed publicly, nor should information that would allow them to be discerned or deduced.  Therefore portions of this declaration and the exhibits attached hereto are redacted from the version that is publicly filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed in _Warner Robins_, _Georgia_____, on June 17, 2016.

                                    _____
                                    AMANDA MYERS
                                    COLONEL
                                    UNITED STATES AIR FORCE

11

## DECLARATION OF SA ROBERT I. KNUFF

I, Robert I. Knuff, declare as follows:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2009 where I have been assigned to the Los Angeles Field Office. I am currently assigned to conduct investigations related to computer intrusions and national security. During my career as an FBI SA, I have participated in numerous computer crime investigations. In addition, I have received both formal and informal training from the FBI and other institutions regarding computer-related investigations and computer technology. Prior to becoming a Special Agent with the FBI, I was employed as a Systems Administrator where I managed various computer systems and networks. I received a bachelor's degree in Industrial and Systems Engineering from the University of San Diego.

2. This declaration is made in support of the government's sentencing position in United States v. Su Bin, No. SA CR 14-131(C)-CAS.

3. In the course of the investigation I have reviewed the contents of e-mail accounts obtained through search warrants pursuant to 18 U.S.C. § 2703, and the contents of digital devices that were at defendant's residence or in his possession that were obtained from Canada through a request pursuant to a Mutual Legal Assistance Treaty, among other evidence. The e-mail accounts that were the subject of those warrants were accounts used by defendant, by ███████████, who is referred to as Unindicted Co-Conspirator 1 or "UC1" in other public filings in this case, or by ███████████,

who is referred to as Unindicted Co-conspirator 2 or "UC2" in other public filings in this case.

4.   Certain messages in the contents of those e-mail accounts and the contents of defendant's devices have been translated.  Each exhibit attached hereto originates from one of those two sources and is a translation, in part or in full, from Chinese to English by FBI or Department of Defense ("DoD") linguists, sometimes with annotations, which have all been peer-reviewed for accuracy according to FBI and DoD policy.  In some instances I have included the relevant portions of text from e-mails, attachments, or other files to create an exhibit that is an excerpt or a composite.  I have also removed FBI internal administrative references and certain header or formatting artifacts from the attached translations as well as the names of individual linguists or reviewers.  In the course of my review, I have found that Su Bin (using e-mail accounts ██████████████████████████████████████████████████████████████████████████████████) was in contact with UC1 (using e-mail accounts ████████████████████████████████████████████████████████████) at least 134 times, and in contact with UC2 (using the e-mail account ████████████████████████) at least eight times, with five of those e-mails being from defendant to both UC1 and UC2.

5.   In general, the e-mail messages and other electronic evidence show that defendant was in contact with UC1 and UC2 about multiple military aircraft and technologies, often exchanging the contents of electronic files, lists of files or folders (directory file listings), or reports about the information they had obtained.  While reviewing those emails and digital devices and translations thereof, I found the following files and learned the following:

2

a. Attached hereto as Exhibit 3 is a copy of an e-mail sent on August 13, 2012, from UC1 to UC2 and the attached report titled "Work Summary of Intelligence Collection on C-17 Project (Report)" describing the computer intrusion that resulted in the theft of data related to the C-17 military cargo airlift.

b. Attached hereto as Exhibit 4 is a copy of an e-mail that UC1 sent to himself on October 30, 2012, that attached a copy of his military identification.

c. Attached hereto as Exhibit 5 is a copy of an e-mail that UC2 sent to a person named "████████" on March 19, 2012, attaching a copy of UC2's Hong Kong identification.  Other identifying documents I have found in UC2's e-mail account include his Chinese passport.

d. Attached hereto as Exhibit 6 is a copy of an e-mail that UC1 sent to himself on June 28, 2012, with the subject "Boss" written in English and attaching a photograph showing UC2 depicted in military uniform.

e. Attached hereto as Exhibit 7 is a copy of an e-mail sent on September 28, 2010, from UC1 to a person named "████████" attaching a report titled "Elementary analysis on espionage work on the US professional network."

f. Attached hereto as Exhibit 8 is a copy of an e-mail sent on February 21, 2013, from UC1 to UC2 attaching a report titled "Briefing on Network Reconnaissance."

g. Attached hereto as Exhibit 9 is a copy of an e-mail that defendant first received from UC1 on October 26, 2011, containing a link to an extra-large archive file, and that defendant forwarded to one of his employees on November 1, 2011.

3

041

i.    Subsequently, On November 2, 2011, defendant sent an e-mail to UC1 attaching a first report that discussed data related to the ██████████████████████████████████████████, also referred to as "Project A" in the affidavit filed in support of the criminal complaint and in other public filings in this matter; defendant re-sent that same report on November 6, 2011, to both UC1 and UC2.  The metadata on that report showed another person, "████████," in fields showing who had "Created" and "Last Modified" the file.

ii.    On November 10, 2011, defendant sent another e-mail to UC1 and UC2 attaching a second, longer version of the report discussing data related to Project A.  In that second Project A report, the metadata showed that while the file was "Created" by "████████," it showed that it was "Last Modified" by "Stephensu." It also introduced references to both the "Second Department, General Staff Headquarters, Chinese People's Liberation Army" and to its "Qingan Corporation," which references did not appear in the version of the report that defendant e-mailed on November 2, 2011, or November 6, 2011, referenced in the previous paragraph.

iii. The significance of the metadata reflecting that "Stephensu" was the last person to modify this version of the report, followed by defendant e-mailing the report to UC1 and UC2, is that I believe it shows that defendant is the person who introduced the references to "Second Department, General Staff Headquarters, Chinese People's Liberation Army" and to its "Qingan Corporation."

h.    Ultimately defendant sent the last and longest version of the report about Project A on November 10, 2011, to UC1

4

and UC2, and that last and longest report is attached hereto as Exhibit 10 along with a copy of the e-mail defendant sent.  That last and longest report retained references to the "Second Department, General Staff Headquarters, Chinese People's Liberation Army" and to its "Qingan Corporation."  The metadata for that report (included in Exhibit 10) showed that the file was both "Created" by and "Last Modified" by "Stephensu."

        i.    Attached hereto as Exhibit 11 are translations of selected contacts found on defendant's digital devices, specifically two of defendant's Samsung Galaxy Note phones and his Macbook Pro laptop that I have combined into one document.  Included in those contacts are "███████" as "Stationmaster," two references to "Qingan," and multiple references to military entities.

        j.    Attached hereto as Exhibit 12 is a copy of an e-mail sent by UC1 to UC2 on December 20, 2012, attaching a report titled "2011 Work Summary (Report) of the Qing-An Corporation Shenzhen Station of the Intelligence Department of CCPLA General Staff Headquarters."  I learned from an FBI linguist that CCPLA, or "PLA," is a reference to the People's Liberation Army.

        k.    Attached hereto as Exhibit 13 is a copy of an e-mail sent by UC1 to a person named "███████" on March 8, 2010.  That e-mail attached thirteen reports, all dated on or about August 10, 2009 and addressed to Qing'an Corporation, only some of which are attached hereto as the following exhibits:

        i.    Exhibit 13.a is an attachment labeled as Intelligence Note Number 1, titled "Table of Overseas Locations Development Plan."  This report listed expenses totaling 2,768,000 RMB.  Based on open source materials I have reviewed, the conversion

5

rate on August 10, 2009 was approximately 6.835270 RMB to 1 USD, and 2,768,000 RMB converts to $404,958.40.

        ii.   Exhibit 13.b is an attachment labeled as Intelligence Note Number 3, titled "Report on Establishment of the Shenzhen XXX Cover Company," that referred to a "Budget Expenditures Table," which I believe, based on the content of the document, is another attachment titled "Expanses for Company Establishment," which is also included in Exhibit 13.b.  This report listed expenses totaling 6,751,800 RMB.  Using the conversion rate of 6.835270 RMB to 1 USD, 6,751,800 RMB converts to $987,788.34.

        iii. Exhibit 13.c is an attachment labeled as Intelligence Note Number 4, titled "Shenzen XXX Corporation Staffing and Organizational Structure."

        iv.   Exhibit 13.d is an attachment labeled as Intelligence Note Number 10, titled "Collection Equipment Plan Chart."  This report listed expenses totaling 1,190,000 RMB.  Using the conversion rate of 6.835270 RMB to 1 USD, 1,190,000 RMB converts to $174,097.00.

    l.   Attached hereto as Exhibit 14 is a copy of an e-mail sent by defendant to UC1 on February 2, 2010, attaching a document discussing data related to the C-17, along with the document's metadata.

    m.   Attached hereto as Exhibit 15 is a copy of an e-mail sent by defendant to UC1 on January 23, 2010, attaching a document discussing data related to the C-17, along with the document's metadata.

044

n.    I have reviewed an e-mail sent from UC1 to defendant on October 22, 2012, in which UC1 sent to defendant an e-mail message in Chinese, and among the Chinese characters wrote "BOSS SU" in English.

6.    I have reviewed the e-mail referred to in paragraph 52 on page 36 of the affidavit in support of the criminal complaint filed in this matter.  The specific aircraft referred to is the ████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.  This declaration is executed at Los Angeles, California, on June 16, 2016.

_____
ROBERT I. KNUFF

7

# Exhibit 1

# 2016 Cost Estimate

046

| COLUMN B | COLUMN C | COL. F | COL. O | COL. P | COLUMN R | COLUMN S | COLUMN T | COLUMN Y | COLUMN Z | COLUMN AB |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2016 List of Effected Page (LOEP) Count | | | (Multiply Column O x $100.00 per text page) | (Multiply Column P x $150.00 per illustration page) | Total Cost of Creation (AddColumn R and S) | (Multiply Column F x 4.1 hours/page) | Cost of Engineering (Multiply Column Y x $200/hour) | Total Cost of Development (Add Column T and Column Z) |
| File Name | TITLE: | Combined Page Count for Illustrations and Text | # Text Pages | # Illustrations Pages | Cost per Manual for Text Page Only | Cost per Manual for Illustrations Only | Total Cost for Text/Illustrations | Total Hours per Technical Order Manual | Estimated Technical Order Engineering Cost | |
| 00-25-113-C17 | Technical Manual: Organizational Maintenance: Critical Alloys and Precious Metals Parts List | 504 | 504 | 0 | $ 50,400.00 | 0 | $ 50,400.00 | 2066.4 | $413,280.00 | $463,680.00 |
| 1C-17A-1-2 | Supplemental Flight Manual: Mission Computer | 656 | 420 | 236 | $ 42,000.00 | $ 35,400.00 | $ 77,400.00 | 2689.6 | $537,920.00 | $615,320.00 |
| 1C-17A-2-12JG-24-1 | Technical Manual: Job Guide, Organizational Maintenance: Servicing Electrical Power | 56 | 39 | 17 | $ 3,900.00 | $ 2,550.00 | $ 6,450.00 | 229.6 | $45,920.00 | $52,370.00 |
| 1C-17A-2-12JG-29JG-4 | Technical Mnaul: Job Guide Organizational Maintenance Servicing Hydraulic Power | 340 | 138 | 202 | $ 13,800.00 | $ 30,300.00 | $ 44,100.00 | 1394 | $278,800.00 | $322,900.00 |
| 1C-17A-2-47JG-20-1 | Technical Manual: Job Guide, Organizational Maintenenance: Onboard Inert Gas Generation System Distribution and Control | 174 | 124 | 50 | $ 12,400.00 | $ 7,500.00 | $ 19,900.00 | 713.4 | $142,680.00 | $162,580.00 |
| 1C-17A-4-56 | Cockpit Glass Manual | 100 | 84 | 16 | $ 8,400.00 | $ 2,400.00 | $ 10,800.00 | 410 | $82,000.00 | $92,800.00 |
| 33D7-50-1592-1 | Technical Manual: Intermediate Maintenance Instruction with Illustrated Parts Breakdown, Intermediate Maintenance: Fuel Quantity Computer | 176 | 107 | 69 | $ 10,700.00 | $ 10,350.00 | $ 21,050.00 | 721.6 | $144,320.00 | $165,370.00 |
| Totals | | | | | | | $ 230,100.00 | | $1,644,920.00 | $1,875,020.00 |

# Exhibit 2

# 2010 Cost Estimate

048

| COLUMN B | COLUMN C | COL. F | COL. O | COL. P | COLUMN R | COLUMN S | COLUMN T | COLUMN Y | COLUMN Z | COLUMN AB |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2010 List of Effected Page (LOEP) Count | | | (Multiply Column O x $100.00 per text page) | (Multiply Column P x $150.00 per illustration page) | Total Cost of Creation (Add Column R and S) | (Multiply Column F x 4.1 hours/page) | Cost of Engineering (Multiply Column Y x $200/hour) | Total Cost of Development (Add Column T and Column Z) |
| File Name | TITLE: | Combined Page Count for Illustrations and Text | # Text Pages | # Illustrations Pages | Cost per Manual for Text Page Only | Cost per Manual for Illustrations Only | Total Cost for Text/Illustrations | Total Hours per Technical Order Manual | Estimated Technical Order Engineering Cost | |
| 00-25-113-C17 | Technical Manual: Organizational Maintenance: Critical Alloys and Precious Metals Parts List | 504 | 504 | 0 | Not available for Historical Data | Not available for Historical Data | Not available for Historical Data | 2066.4 | $413,280.00 | $413,280.00 |
| 1C-17A-1-2 | Supplemental Flight Manual: Mission Computer | 608 | 420 | 236 | Same | Same | Same | 2492.8 | $498,560.00 | $498,560.00 |
| 1C-17A-2-12JG-24-1 | Technical Manual: Job Guide, Organizational Maintenance: Servicing Electrical Power | 60 | 39 | 17 | Same | Same | Same | 246 | $49,200.00 | $49,200.00 |
| 1C-17A-2-12JG-29JG-4 | Technical Mnaul: Job Guide Organizational Maintenance Servicing Hydraulic Power | 222 | 138 | 202 | Same | Same | Same | 910.2 | $182,040.00 | $182,040.00 |
| 1C-17A-2-47JG-20-1 | Technical Manual: Job Guide, Organizational Maintenenance: Onboard Inert Gas Generation System Distribution and Control | 174 | 124 | 50 | Same | Same | Same | 713.4 | $142,680.00 | $142,680.00 |
| 1C-17A-4-56 | Cockpit Glass Manual | 92 | 84 | 16 | Same | Same | Same | 377.2 | $75,440.00 | $75,440.00 |
| 33D7-50-1592-1 | Technical Manual: Intermediate Maintenance Instruction with Illustrated Parts Breakdown, Intermediate Maintenance: Fuel Quantity Computer | Unknown | 107 | 69 | Same | Same | Same | Unknown | Unknown | $0.00 |
| Totals | | 1660 | | | | | $ 166,000.00 | | $1,361,200.00 | $1,527,200.00 |

(Assuming All Pages Were Text Pages at $100/page)

049

# Exhibit 3

# E-mail and Attached C-17 Project Summary Report

050

c17

**Subject:** c17
**From:**
**Date:** 8/13/12 1:55 AM
**To:**

Attachments:

C-17项目总结报告.doc                                    27.5 KB

051

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



91-1300 Enterprise Avenue
Kapolei, HI 96707

Task Number(s) and Date Completed:    325950, 9/29/2014

Source Language(s):                                 Chinese

Target Language:                                       English


VERBATIM TRANSLATION


Abbreviations:

*Italics*                              Written in English in the source material
[*sic*]                                The content is provided as it appears as in the source material
TN:                                    Translator's Note



File name is:

*C*-17projectsummaryreport.*doc*

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



91-1300 Enterprise Avenue
Kapolei, HI 96707

Task Number(s) and Date Completed:    325951, 9/26/2014

Source Language(s):                          Mandarin Chinese

Target Language:                             English


VERBATIM TRANSLATION


Abbreviation: [TN]      Translator's Note
            Italics      Appear in English in source material
[TN: The underlined text is highlighted in red in the source document.]

File Requirement: Project Name: *C-17* Work Summary

Leading Group Member: ███████████████████

Operational Staff: ████████████████████████████████████████████████

███████████████████████

Sample Document: Refer to Attachment

Catalogue: Refer to attached *List.txt*

**Work Summary of Intelligence Collection on *C-17* Project (Report)**

*XX* Company:

According to the instructions from higher authority, in 2009 our unit initiated the intelligence collection on *C-17* strategic airlifter, also known as Globemaster, made by U.S. Boeing Company. With supervisory unit's correct lead, we have safely and successfully accomplished the year long mission, made tremendous contribution to our national defense science research development and received great comments from leaders and relevant units. Our work is summarized as follows:

1. **Leaders Have Attached Great Importance to the Mission, Highlighted the Key Point and Given Precise Assignment.**

*C-17* strategic airlifter, the latest and highly flexible U.S. strategic military transport aircraft, is capable of deploying rapid response forces to major military bases globally and sending troops directly to the frontline. If necessary, the aircraft can also take roles such as tactical lifting and airdropping in a variety of conditions. Its inherent abilities of flying long distance, being flexible and adaptable have greatly improved U.S. military's capabilities of global air transportation and troops' deployment. Proposed in 1980s as one of the eight new technological military aircraft development projects, *C-17* is currently the only aircraft in the world that can act as both strategic and tactical airlifter. From 1981, when McDonnell Douglas won the contract, until 1995, when all the flight-testing had been completed, it took 14 years to deliver *C-17*, making it one of the longest development projects in U.S. history. With a total of USD3.4 billion spent on its research and development, *C-17* is also ranked the third most expensive

054

aircrafts in U.S. history. The top two most expensive aircrafts are *B-2* stealth bomber and *E-3* airborne early warning aircraft. Due to our company leaders' serious attention, accurate selection, decisive judgment and strong support, we have successfully accomplished the mission and made significant achievements.

### 2.   Thorough Planning,  Meticulous Preparation and Seizing Opportunities

According to higher authority's instructions and plans, our unit began to prepare the resources for the task in early 2009, and started to ▮▮▮▮▮▮▮▮ in U.S. Boeing Company in August. After months of hard work and tireless effort, in January 2010, for the first time we broke into Boeing's intranet ▮▮▮



▮▮▮▮▮▮▮. Our findings showed that the company's intranet was ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to prevent cyber intrusion. So far we have found ▮▮▮▮▮▮▮▮▮▮connected to its intranet. We exercised extra caution because of Boeing Company's complicated network. After scrupulous work and patient exploration, we finally found *C-17* strategic airlifter relevant document ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Due to our sufficient preparation, we were able to obtain a file list on the server in a short period and downloaded a few files which were confirmed by the field experts as *C-17* related documents.  The acquired documents include information such as *C-17*'s takeoff and landing gear, flying control system and air drop system. Experts in China gave a high appraise to our work, saying that it was their first time seeing *C-17* documents. The experts also confirmed the document's value and its uniqueness in China.

### 3.   Bolstered by Science and Technology, Secure Acquirement and Significant Achievement

To successfully obtain the *C-17* relevant documents requires a rigorous plan and a robust technical support because of Boeing Company's complicated network and its tight security. However, we tackled all the issues step by step. **First, we increased its degree of difficulty for counter-intelligence to ensure our safe collection of intelligence.** From the time of breaking into the company's network to the time of

collecting the intelligence, we had bounced multiple times on the network and made timely bounces

among many foreign countries in order to increase the degree of difficulty for counter-intelligence. When

bouncing around, we also used a lot of tools, routes and servers' support to ensure the safe landing of

intelligent documents. **Second, we used technical treatment and withdrew safely**. As the difficulty of

breaking into Boeing Company's network was beyond our imagination, we had to use technical treatment

on the acquired documents, for example, file splitting, file packing, changing file format, etc. We finally

dodged multiple ███████████████████████ and safely and successfully transferred the

documents out of Boeing Company. **Third, we bounced around repeatedly and withdrew safely.** To

ensure a secure intelligence collection and to evade the tracking by U.S. law enforcers, we planned a

bouncing route through multiple foreign countries, at least through three countries and made sure that one

of them has no friendly relation with the U.S.  To successfully accomplish the mission, we developed five

special paths and servers in foreign fields, and shut off all the paths after the work was done. Fourth, we

achieved a great success with a moderate investment. For the assignment on *C-17* strategic transport

aircraft, we acquired *65G* of data, including 630,000 files and 85,000 folders, which contain information

such as scanned drawings of *C-17* strategic airlifter, correction notices and countersignatures. The

drawing documents include the following information: forward fuselage, center fuselage, aft fuselage,

wings, horizontal and vertical stabilizers, engine suspension systems, etc. The content covers details such

as assembly drawings, components and accessories. Some of the drawings also provide measurements,

tolerances and details of all types of pipelines, cables layout and equipment installations, etc. The

aircraft's flight testing documents are also included. With full details and an explicit file system, it is

claimed by experts as the masterpieces of drawing documents.  It took us one year and a total of

RMB2,700,000 yuan to finish the project. The cost-effectiveness is dramatic and the achievement is

significant.

Due to leaders' serious attention, a sufficient preparation and a thorough planning, we have accumulated

abundant experience for our future work from this project. With confidence and capability, and the lead of

higher authority, we are ready to accomplish new tasks and to make even greater contribution to our

defense construction.

*XX* Company *XX* Station

August 06, 2012

# Exhibit 4

# E-mail and Attached Military ID for UC1

059

Zj

**Subject:** Zj
**From:**
**Date:** 10/30/12 7:43 AM
**To:**



photo.JPG

1 of 2

4/7/16 1:53 PM

### UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION



11000 Wilshire Blvd., Suite 1700
Los Angeles, CA 90024

Task Number(s) and Date Completed:    273216, 4/1/2014

Source Language(s):    Chinese

Target Language:    English

VERBATIM TRANSLATION

[TN:  It is a picture of a Chinese military identification card.]

Serial Number:  Air [Air Force] number ████████ .
Issuing Agency:  93688 Unit, Political Department
Issuing Date:  9/1/2012
Expiration Date:  12/31/2015
████████

Name: ████████████  [STC: ████████████]
Month and Year of Birth: ████ 1981
Sex:  Male
Native Place: ████████████
Ethnicity: ████
Unit:  Unit 93688
Job:  Assistant Engineer
Rank:  Professional Technical Major



# Exhibit 5

# E-mail and Attached UC2 Identification

062

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



91-1300 Enterprise Avenue
Kapolei, HI 96707

Task Number(s) and Date Completed:    325950, 9/29/2014

Source Language(s):                         Chinese

Target Language:                            English


VERBATIM TRANSLATION


Abbreviations:

| | |
|---|---|
| *Italics* | Written in English in the source material |
| [*sic*] | The content is provided as it appears as in the source material |
| TN: | Translator's Note |

*From:* ████████████████████████████
*Subject:* Fwd: HP0004.jpg
*Date:* Mon, 19 Mar 2012 21:23:57 +0800
*To:* ████████████████

Below is the forwarded email:


> Sender: ████████████████████████████
> Subject: *Fw: HP0004.jpg*
> Date: March 19, 2012, GMT +0800, 8:34:37 PM
> Reciver: ████████████████████████████
>
>
>
>
> ------------------ Original Email -----------------
> Sender: ████████████████████████
> Sent Time: March 15, 2012, 14:39
> Receiver: ████████████████████████
> Cc: (None);
> Subject: *HP0004.jpg*
>

[Duplicate images and blank pages omitted]



Chinese matches English.

065



Chinese matches English.



Chinese matches English.

Case 8:14-cr-00131-CAS    Document 75    Filed 06/30/16    Page 71 of 153   Page ID #:607

# Exhibit 6

# E-mail and Attached Photo of UC2 in Military Uniform

067

**Return-Path:** ███████████████

**Received:** from [172.16.10.102] ([119.139.95.176]) by mx.google.com with ESMTPS id pt2sm1388148pbb.58.2012.06.28.01.08.50(version=TLSv1/SSLv3 cipher=OTHER); Thu, 28 Jun 2012 01:09:01 -0700 (PDT)

**Subject:** Boss

**From:** ███████████████

**Message-Id:** <0D442B9D-2F6F-4031-9AAC-FB085D80EAA8@gmail.com>

**Date:** Thu, 28 Jun 2012 16:08:45 +0800

**To:** ███████████

**X-Mailer:** iPhone Mail (9B206)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**

068



91-1300 Enterprise Avenue
Kapolei, HI 96707

Task Number(s) and Date Completed:    350691, 11/7/2014

Source Language(s):                          Chinese

Target Language:                             English


VERBATIM TRANSLATION


Abbreviations:

*Italics*                    Written in English in the source material
[*sic*]                      The content is provided as it appears as in the source material
TN:                          Translator's Note

[TN:  The attachment is a photo.  It seems that the photo was taken in a vehicle.  The person in the front is likely ███████████████████████.  The front person wears green PLA Army uniform, likely 2007 version, with two-star insignia.  Based on open source, this insignia likely indicates the ranking of Lieutenant Colonel.

The person in the back wears gold-rimmed glasses and has the same green PLA Army uniform, likely 2007 version.  However, this person has a four-star insignia which indicates the ranking of Senior Colonel.  In the picture, this person is looking at his electronic device.]



Photo Attachment.

# Exhibit 7

# E-mail and Attached Report Re: Espionage Work on U.S. Professional Network

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



11000 Wilshire Blvd., Suite 1700
Los Angeles, CA 90024

Task Number(s) and Date Completed:    273216, 4/7/2014

Source Language(s):                             Chinese

Target Language:                               English


VERBATIM TRANSLATION

*From:* ███████████████████
*To:* ███████████████
*Subject:* Forward director
*Date: Wed, 29 Sep 2010 10:43:24 +0800*
Please text message when received.

**Elementary analysis** on espionage work on the US professional network.

Existing difficulties and recommended strategies.

In recent years, under the support of higher-level leaders, we have achieved tremendous results in espionage work on professional networks. We continuously broke into the US military technology field, identified key personnel, established multiple infiltration target channels, gained controlled of a batch of important personal computers and servers, obtained a large batch of significant intelligence material, the efficiency rate of the military technology information is apparent, we have made a great leap in the espionage work. However, there exist some difficulties and problems that will affect our future works, they are mainly:

**1, There exists many restrains that will make espionage work on dedicated network more difficult.**

Through actual practice in recent years, we have felt that any new affair exists various degree of difficulties and problems, if such problems are adequately solved, it would help the progression of the affair, if such problem is ignored, it would affect the on-going work.

**1) Focused on the worsening network security issue, the US has established specialized organization to ensure network security; it increases the difficulty in obtaining intelligence.**

The US National Security Agency and some of the US military branches have long been conducting network intelligence gathering works. But with the World-Wide-Web's widen use in the political, economical, military, diplomatic and social fields; it brought changes to many fields in the world. For that, new strategies and methods in intelligence gathering and transmission have developed. On June 23rd, the US Department of Defense officially announced the establishment of United States Cyber Command; it becomes the first country to establish such command department. This means that the US has taken a step ahead in the aspects of countering threats in network security and non-traditional security threats. US Department of Defense Secretary Gates wrote in a signed memo: "Our growing dependency on the Internet, and the series of cyber threats that we are facing, are adding new risks to national security", the establishment of US Cyber Command will help the US Department of Defense in "ensuring freedom in cyber space." The US Military's opinion is that cyber warfare is a series of cyber attack/defense actions to disturb, break the enemy's network information system, and to ensure the normal operation of its own network information system. This further increases the difficulties in the espionage work on professional networks.

**2) The mass use of all types of network information system and equipment increases the difficulty in obtaining and decrypting information.**

Currently, with the rapid globalizing development in information technology, the changes in the information field spearheaded by the network, has accelerated espionage work towards broader security field, it also brought significant changes in international security environment and espionage work. First, the conflicts over the traditional international security field still exist. Second, the obvious increase in non-traditional security field activities. Third, the line blurs between the traditional and non-traditional security fields. For example, the anti-terrorism war in Afghanistan has been going on for years, with aggressive progression of intelligence warfare, but bin Laden is still nowhere to be found, it makes the national security issue more complex and broad. With the rapid development of Very-large-scale

074

Integration and Ultra-large-scale Integration, satellite communication, fiber-optics communication, and broadband technologies, mobile communication, and international World-Wide-Web, which have spread the whole world, brought changes to the political, economic, military, diplomatic and social fields across the world.  It also changed people's living and working habits, changed our strategy in intelligence gathering and battle method of espionage.  The utilization of large amount of new technology, new strategy and new equipment has greatly increased the difficulty in gathering and decrypting information, the strategy on espionage work must update along with time.

**3)  With the large increase in systems and agencies that does espionage work on professional networks, making it difficult to retain highly-skilled talents.**

In recently years, due to the fact that espionage work through dedicated networks has achieved great results, it has gathered significant attention by the intelligence detection system of multiple countries, with lead to a large increase in systems and departments that does espionage work on professional networks.  Because it is a relatively new technology, with younger workforce, majority of the organization must cooperate with local related technology research organization in order to accomplish such task.  Also, some of the supervisors and professional workforce at the cooperating agencies are relatively unstable, personnel turnover is larger.  Adding on to the fierce competition between all the agencies, it makes the cooperating model more difficult, unable to guard and safe keep battle positions abroad in the long-term, unable to keep the technical research and development personnel in the long-run, which creates great waste in resource and talent.  Sometimes when responding to larger important tasks, it seems we are unable to accomplish what we want to do, unable to recruit the workforce in time, so the work stays at a certain level, unable to push further.  Therefore, maintaining stable organizations, workforce and funding are the challenges needed to be addressed in espionage work in professional network.

**4)  The widespread of free network security services and software shorten the effective life-cycle of investigative equipment and software.**

As early as the 1990's, before the widespread of computers, World-Wide-Web and broadband technology; military attaches officers in countries like the US and Russia has long been using hacking technology to obtain related intelligence information in their stationing country.  Today, the use of new technologies changed the working and living habits of the people.  The society has become digitalized, and paperless.  Therefore network security has attracted much attention from governments and organizations everywhere; it has accelerated the rapid development of network information security technology.  Especially in the recent years, the appearance of some free network security service and software, raised people's awareness and the overall technology in network security, it results in the shortened effective life-cycle of single purpose investigative equipment and software.  Especially in investigation against important targets and professional fields, it requires prior traditional espionage investigative strategies.  For example:  When attacking well-guarded national defense, military and technology departments, it requires the prior filtration of espionage personnel.  Through espionage work, develop key personnel inside the key target or field, or assess and identify key personnel through commercial cooperation and conference, obtaining intelligence by bypassing its network security system.  Another way is to install software/hardware investigative protocol and equipment.  After the successful installation infiltration, the special software/hardware protocol installed by espionage personnel can obtain information on-scene or remotely.  Overall, this increases the difficulty in espionage work on professional network investigation.

**5)  Internet usage policy brought certain difficulties in obtaining social, political, and military intelligence.**

In recent years, through our construction of intelligence battle positions used on espionage work, we were able to secretly infiltrate certain special pages of "adult friendship" sites using superior technology, installed Trojan horse software using unpublished security backdoor programs.  We were able to gain control of 20-plus computers and servers, obtained the blueprints of US ███████████████████████

███████████████████████████████████  But during the process of investigation work against US military fields, there is a certain level of difficulty in obtaining social, political, and military intelligence due to the strict internet usage policy in the US military.  If we were to take the indirect attack method, due to the language restriction of its ally countries, there is need for a large amount of foreign language personnel to complete the task, which brings greater funding pressure, resulting in the temporary blockage in obtaining US social, political and military intelligence.

**6)  Increasing investment over the years in system research and development, and unclear customer requirements, are effecting further development of the work.**

In recent years, due to the heightened security measures in network operating system and equipment, we have been increasing our funding annually on its system research and development. For example, while we were conducting outer perimeter espionage and network infiltration against ███████████, we found out that its employee e-mail system had flaws, but the flaws we found were discovered for the first time in the world, there weren't any existing programs that can be adapted.  To counter that, we quickly assembled a team to conduct research and development for attack; we were able to successfully enter the intranet by beating the company e-mail server.  And to expand on the result, we invested more funding and resources to develop ███████████ process flaw spillage program, gained control of the intranet's important personal computers and servers, obtained a large batch of significant intelligence material, with tremendous effectiveness.  However, due to the current large and complex operating system, it requires "kernel level" installation procedure on the target; and many procedures require customer specific templates.  These research and development work cannot be completed by one or two departments, it requires collaboration work among many departments, which dramatically increases the funding needed.  At the same time, because the customer's requirement is unclear, it results in wasted labor and funding, it future increases the difficulty in obtaining intelligence.

**7)  Understanding the nature of espionage work on professional network, further the global development of espionage warfare.**

When conducting espionage work against US professional networks, we must understand the nature of network technology.  Therefore, constructing battle positions

outside of China for espionage work on professional network has become one of the necessary strategies in cyber warfare.

**2, Recommended strategies.**

Going forward, intelligence gathering work will face even more new situations, new challenges, and new problems.  Therefore, we must start working on "Three Focus, and One Insistence", completing all the tasks given by the superiors with great effort.

1) **Intelligence gathering should focus on the specific task given by the superiors.**  Espionage must show its characters, espionage work on professional networks must focus on the topic given by the leaders.

2) **Intelligence gathering/securing tasks should focus on important and sensitive national events.**  With our country's elevating international status in politics, economics and military, we have participated and hosted more important international events, with the growing issues of international terrorism activities; there are opposing forces and organizations domestically and internationally who are bitter about their defeat.  Therefore, the political sensitivity of these important events' intelligence security tasks has grown.  It also rises higher and more requirements for intelligence gathering activities.

3) **Continue to focus on the forefront of the national economic development, prepare the early stage work for military strategic construction.**  In recent years, with our country's rapid outgoing-type economic development, its economic interests have reached every field and edge of the world.  Therefore, the country's political, economical, and military security points are moving outwards and expending.  The established military forces with the existing economic model can no longer ensure our country's rapid economic development and security interest.  The trend is for our country to establish military forces to protect overseas economic interests.  Therefore, espionage work on professional networks must exercise its unique characteristic, focus on the military establishment strategy.

4) **Insist on the guidance of scientific development; continuously build new fields of intelligence gathering work.**  With the development of science and technology, new strategies and methods of intelligence gathering are developed.  To adapt to the change, all levels of leaders must focus on the integration of intelligence and the work of seeking new methods, continuously obtain competitiveness from science and technology.  We must install the new ideology that intelligence gathering strategies must be based the intelligence and technology, build espionage work on professional networks into the bridgehead and commanding point of "information warfare."

5) **Strengthening the construction of the team doing espionage work on professional network, aggressively recruit top technical talents, ensure the stable development of the work.**  The trend of modern technology is that "everything is doable, the challenge is to predict everything."  Therefore, the construction of the intelligence gathering team and the maintenance/recruit of talent will be the key on the continuous and stable development of espionage work on professional networks.  We must create a new road on building an intelligence team that meets the needs of domestic/international security development.

6) **Increase investment on strategic placement, establishment of battle position and equipments.**  To accommodate the needs of national and military intelligence gathering

077

construction, in terms of battle position construction going forward, we should prioritize more on positions abroad, while still maintaining domestic positions.  In terms of tasking assignments, we should prioritize more on national security, while maintaining social stability.  In terms of prioritizing situations, we should focus on urgent and sensitive issues, while still maintaining long-term development.  In terms of effective products, we should prioritize on science and intelligence, while maintaining other fields.

7) **Better management for more efficient use of limited resources.**  Due to limited labor, resource and funding, while conducting espionage work on professional networks, resources must be concentrated on national mission and self-selected key targets.  Focus on the personnel needed in the attacking field, and outer-perimeter related personnel, gradually increase funding, change the upside-down situation that we gather intelligence first, then we are given funding later, guiding espionage work on professional network towards a virtuous cycle.

078

# Exhibit 8

# E-mail and Attached Briefing on Network Reconnaissance

079

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



11000 Wilshire Boulevard, Los Angeles, CA 90024

Task Number(s) and Date Completed:    273218, 4/9/2014

Source Language(s):                                Chinese

Target Language:                                English


VERBATIM TRANSLATION


Abbreviations:
*Italics*          English

[ ]                Translator's note

*Date:* *Thu, 21 Feb 2013 18:07:45 +0800*

*Subject:* Work briefing

*From:* ████████████████████

*To:* ████████████████████████

081

# Briefing on Network Reconnaissance

For many years, our company has adopted the general and standardized network reconnaissance methods used by international intelligence agencies in general. In conjunction with our actual situations, we have completed various reconnaissance tasks from higher authorities fairly well. Our briefing is as follows:

 **1. We combine internationally adopted and standardized network reconnaissance methods with flexibility.** An old saying suggests: "A winner is the one who makes the best use of the situations and who is able to guide the situations accordingly."**First, in order to adapt to the S&T development, our approach to reconnaissance needs an integration of spying methodology and technology.** This method is more specific and reliable and it always can generate desirable results provided that there are meticulous organizational efforts and careful implementation. **Second, we have gradually established technology bases outside China for the sake of security/safety and stability.** So far, proxy servers have been set up in the U.S., Korea, Singapore, etc. and are changed irregularly based on the security/safety environment. **Third, machine rooms are set up in the surrounding areas/regions for work convenience.** Our machine rooms have been legally set up in Hong Kong and Macao respectively. We have entire control of the building facilities, equipments, wire and personnel (other companies in China don't yet have these capabilities so far). **Fourth, in order to avoid diplomatic and legal complications, reconnaissance work and intelligence collection are done outside China.** The collected intelligence will be sent first to a pre-ordered temporary server placed outside China or via a proxy server which is placed in a third country by an intelligence officer before it finally gets to the surrounding regions/areas or a work station located in Hong Kong or Macao. Then, the intelligence is picked up and transferred to China in person. By doing so, we not only are able to protect the safety of our intelligence officers and relevant personnel to the utmost but also to root out possible legal and diplomatic conflicts. More margins are left for struggle(s).

**2. We apply relevant rules set for espionage work to conduct network reconnaissance work.** Reconnaissance and intelligence work allows no mistake. **First, there are just a few but highly qualified personnel involved as core people.** There are just three members on the team and they are the core people to engage in network reconnaissance work. Their main responsibilities are to accept tasks, assign the work, collect intelligence and coordinate the work relations outside China in order to provide necessary conditions to support the reconnaissance work. **Second, the actual work staff will carry out their own work individually and there's no crossover with top-down leadership.** There are 12 actual staff members who are respectively in charge of surveillance, control and safeguard, analysis, integration as well as the technical maintenance on the proxy servers and the machine rooms placed outside China. There are five logistical personnel; their main work is to ensure the smooth traffic flows in and out of China; the work inside China and the daily work at the residences.

**3. Our intelligence channel(s) are fairly stable and the intelligence output is fairly consistent.** Due to the limitations on personnel and resources, the current chief targets are the U.S. and Taiwan. The focus on the U.S. is primarily on military technology but also touches upon other areas; whereas the focus on Taiwan is mainly on military maneuver and military buildup. Now, we've kept abreast of the American companies like ████████████████ etc. and the focus is mainly on those American companies belonging to the top 50 arms companies in the world.

**4. We have obtained important achievements and many are in categories and series.** In recent years, we, with relentless work and through multiple channels, have obtained respectively a series of military industrial technology data including *F-35, C-17,* ████████████████ as well as Taiwanese military maneuvers, warfare operation plans, strategic targets, espionage activities and so forth.

[End of document]

# Exhibit 9

# E-mail Thread re: Archive Report Material

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



11000 Wilshire Blvd., Suite 1700
Los Angeles, CA 90024

Task Number(s) and Date Completed:    531858, 4/27/2016

Source Language(s):                  Chinese

Target Language:                     English

VERBATIM TRANSLATION

085

[*FW_forward: Archive* report material.docx.docx]

*From: "Stephen Subin \(Gmail\)"* ██████████████████>
*Subject: FW:* forward ：*Archive* report material
*Date: November 1, 2011 5:37:56 PM PDT*
*To:* ██████████@lode-tech.com

████████

Hello, please download the materials from the link below

*Best regards,*


*Stephen Subin  SU Bin*

*Lode Technology Co., Ltd.*

Building 1-1, Caiman Street Dieshu, No. 67 Chaoyang Road, Chaoyang District, Beijing.
Zip code: 100123

*Building 1-1, No. 67 Caiman Street Chaoyang Road, Beijing P. R. China，ZIP:
100123*

Direct line: ██████████

*Direct line:* ██████████

Mobile: ████████████████ *(3G)*

*Mobile:* ████████████████ *(3G)*

Telephone: ██████    Fax: ██████

*TEL:* ██████    *FAX:* ██████████

*Skype:* ████████

*Hotmail:* ████████████████████

*webfax:* ████████

████████████

*P Before printing, think about the environment*

P Think about our environment and trees before printing. Save paper.


*From:* ██████████@qq.com]

087

**Sent:** *Tuesday, November 01, 2011 10:46 PM*
**To:** *stephensubin*
**Cc:** *StephenSubin*
**Subject:** Forward *: Archive* Report Materials


------------------ Original E-mail ------------------
Sender: ███████████████ @qq.com>;
Sent time: October 26 , 2011(Wednesday) 3:10PM
Recipient: "Stephen Subin"<s████████████ >;
CC: "Stephen Subin'████████████ >;
Subject: *Archive* Report Material

Cellphone number of President ██████


Extra large attachment sent from QQ mailbox

*Archive*reportmaterial.*zip* (45MB, 2011 年11 月11 日 15:05 Expire)

Enter download page *:* ███████████████
██████████████████████████████████████████
███████████████████████████

# Exhibit 10

# E-mail and Attached Report Re: Project A with Metadata

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



11000 Wilshire Blvd., Suite 1700
Los Angeles, CA 90024

Task Number(s) and Date Completed:   27321, 4/11/2014

Source Language(s):                Chinese

Target Language:                   English


VERBATIM TRANSLATION



Abbreviations:

*Italics*          Original material already in English
[]                 Translator notes

**From:** *"Stephen Subin"* ██████████ >
**To:** ████████ < ████████████ >, < ████████████ >
**Subject:** 收邮件 receive the email
**Date:** *Fri, 11 Nov 2011 07:48:07 +0800*

████ ██████ (STC: ████████ )

收邮件  incoming email

*Best regards,*

*Stephen Subin*苏斌 (STC:5685/2430)

*Lode Technology Co., Ltd.*

北京市朝阳区朝阳路67号财满街叠墅1号楼配套 邮编：100123

*Building 1-1, No. 67 Caiman Street Chaoyang Road,*Chaoyang District *Beijing P. R. China，  ZIP:100123*

直线电话: 010-85757395

*Direct line:* ██████████

手机: ████████████████ (3G)

*Mobile:* ████████████████ *(3G)*

电话 : ████████    传真 : ████████

*TEL:* ████████    *FAX:* ████████

*Skype:* ████████

*Hotmail:* ████████████████████

*webfax:* ████████

████████████

*P Before printing, think about the environment,* Our big trees, please conserve paper

P在打印之前, 想一下我们的环境, 我们的大树, 请大家节约用纸

About The Importance of the US ███████████████████████████████████ Data

Second Department, General Staff Headquarters, Chinese People's Liberation Army

We acknowledge receiving the ████████████████████████████████
documents which your department, Qingan (STC: 1987/1344) Corporation, has transferred over, your comrades introduced to us certain situations and explained the samples of the related documents, we have also conducted careful research and reading of the sample documents, these are the materials that we have fondly dreamed about in our work, and it is our first time having contact with secret data related to the US military's ██████ .

This set of materials has large quantities of US military DOD-E and DOD-F classification grade materials, previously the highest classification level of the materials we obtained was the DOD-D level materials. This set of materials is the highest-level classification we have seen of all the US military materials, and it is extremely valuable.

These materials, including the overall project files, design guideline documents, blueprints and testing data and ██████████████████ , the project summary report documents, project management processes documents and so on, have basically covered the entire project, and through our earnest absorption of these documents, we firmly believe that this set of documents will allow us to enhance by several magnitudes the corresponding scientific work levels, and can allow us to rapidly catch up with US levels and research and develop better counter-measures.



which has showed us perfectly the US military's navy, air force, and army's complete coordinated combat thinking.





Due to overseas export restrictions regarding high-level technology, technology blockades and a relatively closed environment, which caused our institute to have a low understanding of the relevant information of the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ which your section provided is the more pertinent information related to this system which our institute has seen for the first time.



This set of documents contain the ███████████████████████████ ████████████████████████████████████████████████████ ██████████████████ and other valuable data. Seen for the first time are the ███████████████████████████████ █████████ and other technical details. ████████████████, and directly provided for us powerful support and calculated data to research counter-measures. This set of materials provides extremely important reference values for our institute to carry out this kind of research, and can speed up by a large scale our institute's research advancement, enabling us to achieve comprehension of the █████████████ ████████ core technologies.



The diagram above is in the document of the related US ███████████████████████
███████████████████████████████████████████████ his document has
solved our most urgent need, and it is very important with regards to our understanding of our
opponent, and improving our ██████████.



These materials also included the ██████████████████████ ██████████████ for the first time, introducing the ██████████ ████████████████████████████████████████ and provide extremely significant reference value █████████████████████████. This experiment includes:





097



Chinese definitions of the words used in the figures above:





for us to raise the counter-measures capability



this data is exhaustive, has extreme reference value, and is very valuable.



Although parts of the materials are not very comprehensive, but we have seen the partial data and testing methods and these are things we have fondly dreamed about. The completion of the ███████████████████████████████████ had taken 8 years, ███████████████████████████████████████████, "know oneself and the opponent, and will be undefeated in a hundred battles", therefore to understand and grasp each stage of development and the construction process of ████████████ has extremely vital significance in our country's speeding up the development of ████████████
████████████████████████████████

Once again appreciation to the relevant comrades' diligent work, and hope that they can find more of these kinds of documents, so that it enables us to stand easily on the giant's shoulders in this particular scientific and research work, with endless benefits. And request that the leadership of the General Staff Headquarters give vigorous support to this special work of the Chinese Aerospace, Science, and Industry Corporation (CASIC), and to urge the Qingan Corporation to complete this task as soon as possible.


Yours,

Salutations!

016 Aerospace Center
November 11, 2011


102

Metadata for attached report:



# Exhibit 11

# Contacts Found on Defendant's Digital Devices

Selected Contacts Found in Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|---|---|---|---|---|---|
| Shenzhen ██ ██ (stationmaster) | Shenzhen ██ ██ (stationmaster) | | | | |
| ██████ | ██████ | ████ | | | Xi'an Qingan |
| ██████ | ██████ | ████ | | | Xi'an Qingan |
| PLA General Staff ██████ | ██████ | | ██████ | | |
| ██████ | ██████ | ██████ | | | |
| ██████ | ██████ | | ██ | | |
| ██ | ██ | ██ | ██ | ██ | |
| | | | ██ | ██ | |
| ██ | ██ | ██ | ██ | ██ | |
| | ██ | | | | ██ |
| | ██ | ██ | | | |
| ██ | | | ██ | | |

Selected Contacts Found on Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|------------|-----------|-----------|-----------|------------|---------|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Selected Contacts Found in Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|------------|-----------|-----------|-----------|------------|---------|
| | ▓ | ▓ | ▓ | | |
| | ▓ | ▓ | | | |
| | ▓ | ▓ | | | |
| | ▓ | ▓ | | ▓ | ▓ |
| | ▓ | ▓ | | | |
| | ▓ | ▓ | | | |
| | | ▓ | | | |
| ▓ | | ▓ | | | |
| | | ▓ | | | |
| ▓ | | ▓ | | | |
| | ▓ | ▓ | | | ▓ |
| | ▓ | ▓ | | | |
| | ▓ | ▓ | | | |
| | ▓ | ▓ | | | |
| | ▓ | ▓ | | | ▓ |
| | ▓ | ▓ | | | |

Selected Contacts Found in Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|---|---|---|---|---|---|
| ██ | ██ | ██ | | | |
| | | ██ | | | ██ |
| | ██ | ██ | | | |
| ██ | ██ | | | | |
| | ██ | ██ | | | ██ |
| | | ██ | | | ██ |
| ██ | ██ | ██ | | | |
| | ██ | ██ | | | |
| | ██ | ██ | | | ██ |
| | ██ | ██ | ██ | ██ | ██ |

Selected Contacts Found in Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Selected Contacts Found in Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|---|---|---|---|---|---|
| | ██ | ██ | | | ██ |
| | ██ | ██ | | | |
| | ██ | ██ | | | |
| | ██ | ██ | | | |
| | ██ | ██ | | | |
| | ██ | ██ | | | |
| | | ██ | | | ██ |
| ██ | ██ | | | | |
| ██ | ██ | | | | |
| | | ██ | ██ | ██ | |
| | ██ | ██ | ██ | | ██ |
| | ██ | ██ | | | |
| | ██ | ██ | | | |

Selected Contacts Found in Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|---|---|---|---|---|---|
| | ███ ██ | ███ ██ | ██▌▐█ | | |
| | ████████▌ | ████████▌ | | | |
| | ███ ▌ | ███ ▌ | | | ████▙▖ |
| | ███ ▌ | ███ ▌ | ██████▌ | | |
| ████▙▖ | ███▖ | █████▌ | | | |
| | █████▌ | █████▌ | | | ██▌▐█ |
| | ██████▌ | █████▌ | | | |
| | ████████ | █████▙ | | | ██▌▐ |
| | ██████▌ | ██████▌ | ▄█▖ | | |
| | █████▌ | ████ ██▖ | ███▖ | | ██████ |

Selected Contacts Found in Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|------------|-----------|-----------|-----------|------------|---------|
| | ███ | ███ | | | ███ |
| | ███ | █ | | | ███ |
| | ███ | ███ | | | ███ |
| | ███ | ███ | | | ███ |
| | ███ | ███ | | | |
| | ███ | ███ | ███ | | |
| | ███ | ███ | | | ███ |
| | ███ | ███ | | | ███ |
| ███ | ███ | ███ | | | |
| | ███ | ███ | | | |
| | ███ | ███ | | | |

Selected Contacts Found in Defendant's Digital Devices

| First Name | Last Name | Full Name | Job Title | Department | Company |
|---|---|---|---|---|---|
|  |  | ███ |  |  | ███ |
|  | ███ | ███ | ███ |  |  |
|  | ███ | ███ |  |  |  |
|  |  |  | ███ | ███ | ███ |
| ███ | ███ | ███ |  |  |  |
|  | Shenzhen ███ (3G) | Shenzhen ███ (3G) |  |  |  |
| Shenzhen ███ (special) | Shenzhen ███ (special) |  |  |  |  |
| Shenzhen ███ | Shenzhen ███ | ███ subordinate |  |  |  |
| Shenzhen ███ (3) (new) | Shenzhen ███ (3) (new) |  |  |  |  |
| Shenzhen ███ (new) | Shenzhen ███ (new) |  |  |  |  |
| Shenzhen ███ | Shenzhen ███ |  |  | ███ |  |

113

# Exhibit 12

# E-mail and Attached Qing'an Company Work Summary

工作总结



**Subject:** 工作总结
**From:** ███████████████████
**Date:** 12/20/12 2:32 AM
**To:** ███████████████

─ Attachments: ──────────────────────────────────

2012工作总结.zip                                    11.6 KB

1 of 1                                              4/6/16 8:34 AM

**2011 Work Summary (Report) of Qing-An Corporation Shenzhen Station of the Intelligence Department of CCPLA General Staff Headquarters**

In 2012, regarding the party's "18th People's Congress" convention, no matter the international and domestic security situations or work safeguarding stability, they all became very arduous and complex. Under the correct guidance of higher authority leaderships and offices, we have always insisted that the launch of intelligence work must be in line with the principle of "foresightedness, early warning and behind the scenes". We have obtained substantial results in acquiring dynamic situations concerning national security and in research and acquiring significant security and scientific and technical topics, and received full high praise and affirmation from the central committee, military commission and headquarters leaders.

**I. Higher Authority Leaders Attached Great Importance, Yielded Results Were Remarkable**

This year, because the party's "18th People's Congress" convention will convene at the end of the year, various domestic and foreign forces' activities have been exceptionally frequent since the beginning of the year, causing the national security and the work safeguarding stability to become very arduous. Under the correct guidance of higher authority leaderships and offices, we have successfully completed various tasks that the higher authority has given through hard work of all quarters. **First, the leaders attached great importance to setting an example personally, we successfully completed the annual duty.** This year the struggles of the international societies in domains such as politics, economy, security, culture, have become very incisive and intensified. In order to firmly grasp the complex, turbulent and incisive, sensitive international situations and domestic social trend, the higher authority leaders and staff frequently worked late into the night, and repeatedly

Under the correct guidance of leaders at all levels, we promptly recognized the domestic and foreign security situations clearly, grasped the basic law of development of things, and under the extreme volatile and complex situation, we have safeguarded the smooth convening of the party's "18th People's Congress" convention forcefully, and received attention from various countries and all walks of life. **Second, watched closely the possible influence of "the Jasmine Revolution" on us, and ensured national security and social stability.** After "the Jasmine Revolution" created fairly big influence all over the world, we organized the strength to track it closely and monitor its development trend in our country from beginning to end, studied its regular patterns and possible influence it might have on us. This year we discovered that "the Jasmine Revolution" under the support of hostile foreign forces was gradually becoming organized and secretly armed in some areas domestically. We should pay close attention to its development, and must sternly attack its actions. **Third, strengthened the concern over peripheral security, closely grasped the development and change of security situations in the Korean Peninsula, and guaranteed national security to be absolutely safe.** Everything stands if it is prepared, fails if it is unprepared. Everything has the inexorable law of its development movement, so long as we can recognize it correctly and grasp it earnestly, it will make our work be in the advantageous position throughout. Regarding this, we have invested strength and enhanced grasp and research on the Korean Peninsula and Burmese situations since last year. The higher authority leaderships led relevant personnel to penetrate repeatedly into first-line frontier areas to inspect, investigate and study in the field. Its achievement received great attention and unanimous high opinions from the central committee, military commission

116

and headquarters leaders. In order to guarantee the party's "18th People's Congress" convention to convene successfully, we provided powerful judgment and countermeasures on international security situations. **Fourth, through qualitative and qualitative analyses, truly implemented the work of maintaining domestic social stability.** A fortress is easiest to penetrate from inside, forging iron also needs the iron itself to be strong. When our country is advancing into the forest of world strong nations with a development speed and a stable social environment that attract attention from the whole world, guaranteeing internal stability becomes very important. Regarding this, we treated the work of maintaining domestic social stability as the most important in carrying out quantitative and qualitative analyses. This year, focusing on the science and technology development trend and the ideological condition of the people, we have studied and composed successively subject research articles, namely, "Studying Security of Our Country's Construction of Power Grids in View of India Power Outage in Large Areas" and "Use Scientific Development Concept to Lead Social Development", received strong approval from central leaderships and relevant departments, and have tried our best in maintaining social stability and national development. ███████████████████████████████ ████████████████████████ have attacked aggressive bluster of illegal members, and maintained stability of the society.

**II. Reinforced Construction of Science and Technology to Strengthen the Military Forces, Coordination Pace Was Gradually Going Deep**

In order to adapt to the demand of "unifying country enrichment and armed forces strengthening, and constructing vigorously and diligently to consolidate national defense and troops reinforcement", this year we closely focused on central work tasks and expanded work investment and strength in transformation of scientific and technical intelligence results and acquiring the forward position. **The first was that scientific and technical intelligence transformation sped up, and the fruit of armed forces reinforcement construction was remarkable.** We have acquired the US military ██████████████████████████████████ ████████████████████████████████████████████████ , in internal network expansion, we altogether obtained 260G materials. At the same time, we obtained about 60G massive blueprint materials of the military large-scale transport aircraft C-17 from Boeing. We built a set of database on Taiwan population, covering approximately 95% of the entire population of Taiwan, and at the same time infiltrated into Taiwan ████████ program and obtained some materials. We have made due contribution for the armed forces reinforcement construction.

**The second was adapting to international security needs and speeding up the army special operations construction.** In accordance with the directive spirit of the military commission and headquarters in strengthening special operations construction, and to adapt to international strategic security needs, we have further sharpened the special troops actual operational capacity. On July 30, 2012, the headquarters held "the Exchange Meeting on Strengthening Special Operations Construction" in Qing-An Corporation Shenzhen workstation, jointly convened by the Second Bureau of the Second General Staff Headquarters of the CCPLA, Qing-An Corporation and the Special Operations Academy. Altogether more than 10 comrades in charge from headquarters and related aspects attended the conference. The conference representatives focused on the problems of how to do well on special operations construction, carried on ardent speeches and in-depth discussions, and yielded fairly big results.

**III. Existing Insufficiency and Next Plan**

117

This year, although we yielded remarkable results and achievements in surveillance intelligence work, but there was still a definite distance away from the requirements of the higher authority leaderships and offices. **First, there was relatively little in grasping significant sensitive situations.** Because our department personnel were fairly few, there was definite difficulty in fund guarantee and sources. Regarding this, we put the main reconnaissance strength into scientific and technical intelligence acquisition and digestion, there was not enough participation in domestic and foreign political, economic, military and diplomatic situations, mastering of the situation was relatively little. **Second, there was relatively little on core inside situations of the acquired.** Because participation was insufficient, therefore, there was the phenomenon of relatively little in obtaining core and internal situations on essential target reconnaissance. **Third, progressively strengthen intelligence force training, constantly raise the scientific and technological standard of investigation and research.** From now on, we must gradually recruit retired (decommissioned) intelligence personnel from the military and the region, to constantly strengthen intelligence power, and continuously train new strength to solve the problem of understaff. We must continuously adopt hi-tech means for long-term monitoring of key target activities, and enhance the technology content of the obtained intelligence.

In brief, in 2012 work, we sincerely feel that each great achievement obtained in work cannot be separated from the prompt directions from higher authority leaderships and offices and their personal endeavors. The concern and instruction of leaders are the magic weapon for us to do the work well and achieve results. Next year we must continue to obtain more intelligence of foresightedness, early warning, timeliness and policy making, along the correct direction, on the basis of the job performance obtained this year, and complete various tasks that the higher authority leaderships and offices entrust.

# Exhibit 13

# E-mail from UC1 to an Associate Attaching Multiple Reports

Translation of E-mail sent by UC1:



*From:* ███████████████████
*To:* ████████████████
*Subject:* Haha
*Date:* Mon, 8 Mar 2010 14:56:05 +0800

████████████████████

Contact me via telephone if there is any problem.

*Hotmail:* Free, reliable, and opulent e-mail service

████████████████████

120

# Exhibit 13.a

# Attached Report on Overseas Locations Development Plan

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



91-1300 Enterprise Avenue
Kapolei, HI 96707

Task Number(s) and Date Completed:    325950, 9/4/2014

Source Language(s):                          Chinese

Target Language:                             English

VERBATIM TRANSLATION

Abbreviations:

| | |
|---|---|
| *Italics* | Written in English in the source material |
| [*sic*] | The content is provided as it appears as in the source material |
| TN: | Translator's Note |

122

**(2009) Intelligence No. 01**                                                           *XX*

## Table of Overseas Locations Development Plan

**One-time Expenditures on Hardware Table:**

| Name | Quantity | Price | Note |
| --- | --- | --- | --- |
| *HP* Custom-made Server | 4 | 180,000 | *2U*, disc series.  Support hot swapping.  Support hard encryption |
| *IBM* Custom-made Server | 12 | 220,000 | Tower-style server, support hardware encryption system. |
| *DELL* Custom-made Server | 6 | 140,000 | 1U server, support hardware encryption system. |
| Operating System | 20 | 90,000 | Contain *windows, sco-unix, solaris (sparc)* |
| Firewall | 5 | 25,000 | *Cisco pix* |
| Router | 18 | 6,0000 | *Cisco Router* |
| Wireless Router | 3 | 6,000 | *Berlink Wifi* |
| *NAS* System | 6 | 120,000 | *Nas* network storage, support hard encryption. |
| Portable Hard Drive | 6 | 6,000 | *2TB* solid-state encryption storage |

123

| Disaster Recovery System | 3 | 180,000 | 3 machine rooms' disaster backup system.  Guarantee no loss of data |
|---|---|---|---|
| Security System | 3 | 60,000 | 3 machine rooms' security system. Door access control, camera, etc. |
| *UPS* system | 3 | 80,000 | Machine room backup power system |
| Communication System | 3 | 40,000 | Machine room and *VOIP* communication system with China. |
| | | | Total: 1,207,000 (One million two hundred and seven thousand) |

Based on collection work changes, additional temporary minor expenses may be incurred.

**Yearly Fixed Expenditure Table:**

| Name | Quantity | Note | Amount |
|---|---|---|---|
| **Property Lease** | **3 places** | **Rental** | **300,000/Year** |
| **Line Lease** | **22 lines** | **100M, 10M, broadband** | **1,220,000/Year** |
| **Server Hosting Lease** | **4** | **Use for hop-points** | **30,000/Year** |
| **Space Hosting Lease** | **10** | **Temporary document storage** | **5,000/Year** |
| **Domain Lease** | **20** | **Use for pointing direction** | **6,000/Year** |
| | | **Total: 1,561,000 (One million five hundred and sixty one thousand)** | |

This yearly expenditure table is for period of September 2009 to September 2010, next year's expenditure may fluctuate based on local economic condition.

124

Total: 2,768,000 (Two million seven hundred and sixty eight thousand)

**Shenzhen *XXX* Consulting Company**

August 10, 2009

**Key Word:  Overseas location   Development    Report**

Copy: *XX* Intelligence Division                                    File                 Set

Organizing Unit:  *XXX* Company          Contact Person:          Contact Telephone:

125

# Exhibit 13.b

# Attached Report on Establishment of the Shenzhen Cover Company

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



91-1300 Enterprise Avenue
Kapolei, HI 96707

Task Number(s) and Date Completed:     325950, 9/29/2014

Source Language(s):                                  Chinese

Target Language:                                      English


VERBATIM TRANSLATION


Abbreviations:

| | |
|---|---|
| *Italics* | Written in English in the source material |
| [*sic*] | The content is provided as it appears as in the source material |
| TN: | Translator's Note |

**(2009) Intelligence No. 03**                                                                          *XX*

<span style="color: red">**Shenzhen *XXX* Consulting Company (Report)**</span>

_____

[Title and underline are in red]

**Report on Establishment of the Shenzhen *XXX* Cover Company**

**X Unit Qing'an Company:**

For many years, under leaders' direction and care, our unit has been praised for accomplishing impressive intelligence reconnaissance results.  Based on leadership's directives, international and domestic security requirements, proper reaction to increasingly complex foreign and domestic political, economic, military, and counterterrorism situations, and further develop intelligence collection works, we established Shenzhen Weipurui Consulting Company as an intelligence cover company.  Basic organization of the company is as follows:

I.    Company Name:  Shenzhen City Weipurui Consulting Company

II.   Company is located in Futian District, Shenzhen City

III.  Form of Business Organization :  Sole Investor Corporation (⬛⬛⬛⬛⬛ [STC: ⬛⬛⬛⬛⬛])

IV.   Nature of Business:  Science and Technology Consulting

V.    Personnel:  20 people

VI.   Company Management Structure:  Four core members:  General Manager, ⬛⬛⬛⬛⬛ is responsible for overall operation of the cover company; ⬛⬛⬛⬛ [STC: ⬛⬛⬛⬛] is responsible for intelligence research and processing; ⬛⬛⬛⬛ [STC: ⬛⬛⬛⬛] is responsible for cyber technology intelligence collection; and ⬛⬛⬛⬛ [STC: ⬛⬛⬛⬛] is responsible for intelligence filing maintenance, safety and security, party affairs, administrative,

128

and ideological education.  There are two administrative staff, one accountant, one cashier, two drivers, one English translator, and a few others.

VII.    Expenditure Budget

1.    One-time Fixed Expenditure:  a.  office building renovation expense: 200 square meters X 500 Yuan = 100,000 Yuan; b.  fixed assets and office facilities expense: 2.6868 million Yuan (total: 278,68 [*sic*] ten thousand Yuan);

2.    Yearly Fixed Expenditure:  3.965 million Yuan

3.    Grand Total:  278,68 [*sic*] ten thousand Yuan + 3.965 million Yuan = 6.7518 million Yuan

See Budget Expenditures Table for details

End of Report

**Shenzhen *XXX* Consulting Company**

August 10, 2009

**Key Word:  Cover Company    Development    Report**

Copy: *XX* Intelligence Division                                    File                Set

Organizing Unit:  *XXX* Company          Contact Person:          Contact Telephone:

## Expanses for Company Establishment

### One-Time Expenses

| Item | Specs/Model | Unit | Month | Quantity | nit Price/Yua | Amount | Remarks |
|---|---|---|---|---|---|---|---|
| Budget for Office Remodeling Expenses | | | | | | | |
| Office Remodeling Expenses | | Square Meter | | 200 | 500 | 100,000.00 | |
| Budget for Office Equipment Fixed Assets Expenses | | | | | | | |
| Notebook Computer | | set | | 8 | 18000 | 144,000.00 | |
| Desktop Computer | | | | 12 | 12000 | 144,000.00 | |
| Office Desk, Chair | | set | | 16 | 2600 | 41,600.00 | |
| Boss Platform, Chair | | set | | 1 | 20000 | 20,000.00 | |
| Boss Platform, Chair | | set | | 3 | 15000 | 45,000.00 | |
| Sofa | | set | | 4 | 12000 | 48,000.00 | |
| Dormitory Articles | | person | | 15 | 3500 | 52,500.00 | |
| Coffee Table | | piece | | 4 | 2600 | 10,400.00 | |
| Machine Cabinet | | piece | | 2 | 12000 | 24,000.00 | |
| Router | | | | | | | |
| Server | | | | | | | |
| Exchanger | | | | | | | |
| Metal Cabinet | | piece | | 6 | 2400 | 14,400.00 | |
| Safe | | piece | | 2 | 3200 | 6,400.00 | |
| Laser Printer | | set | | 4 | 6000 | 24,000.00 | |
| Color Powder-jet Printer | | set | | 2 | 8500 | 17,000.00 | |
| Color Ink-jet Printer | | set | | 1 | 5500 | 5,500.00 | |
| Car Purchase Expenses | Audi A6 | set | | 2 | 780000 | 1,560,000.00 | |
| Car Purchase Expenses | Toyota Van (Macao-Shenzhen Plate) | set | | 1 | 530000 | 530,000.00 | |
| Sub-total | | | | | | 2,686,800.00 | |
| Budget for Annual Average Fixed Expenses | | | | | | | |
| Lease Expenses for Worker & Staff Dormitory | | square meter | 12 | 150 | 100 | 180,000.00 | |
| Lease Expenses for Network Broadband Lines | | line | year | 6 | 3500 | 21,000.00 | |
| Office Building Lease Expenses/Month | | square meter | 12 | 200 | 180 | 432,000.00 | |
| Office Articles | | | 12 | 1 | 3500 | 42,000.00 | |
| Personnel Salary Expenses | | | 13 | 20 | 8500 | 2210000 | |
| Travel Expenses | | | 12 | | 30000 | 360,000.00 | |
| Vehicle Expenses | | | 12 | 3 | 10000 | 360,000.00 | |
| Entertainment Expenses | | | 12 | | 30000 | 360,000.00 | |
| Sub-total | | | | | | 3,965,000.00 | |
| Total | | | | | | **6,751,800.00** | |

130

# Exhibit 13.c

# Attached Report on Shenzhen XXX Corporation Staffing and Structure

**(2009) Intelligence #4 XX**
Shenzhen XXX Consultant Corporation (Report)
**Shenzhen XXX Corporation**
**Staffing and Organizational Structure**
**X Department Qing-an Company:**
According to the present periphery international security situations and operational requirements for maintaining domestic social stability, and in compliance with the essence of higher authority instructions and the corporations realistic circumstances, initially believed the current size of the personnel force listed below and organizational structure were rather reasonable through long term practice and inspections and through the distribution circumstances of natural resources for domestic and foreign intelligence.
**1. Shenzhen Work Station Staffing and Organizational Structure**
**Shenzhen Work Station:** Set up the station with 4 leaders (1 Director and 3 Deputies). Next setup the entire intelligence editing department, investigation and research department, current politics intelligence department, science and technology department, integrated department, all together being 5 departments. Shenzhen Weipurui (Weaponry) Consultant Corporation is the outside cover company for the Shenzhen work station, personnel are responsible for being sent out from this station.
Staffing is. Intelligence editing department 5 people, investigation and research department 3 people, science and technology intelligence department 7 people, current political intelligence department X people, administrative department X people, altogether XX people.
**2. Intelligence Substation Staffing and Organizational Structure**
**1. Tonghua (city) Intelligence Substation.** Responsible for reconnaissance and intelligence collection operations oriented towards the Korean Peninsula. Altogether there are 9 personnel assigned, among them, 8 people are oriented towards North Korea, 1 person is oriented towards South Korea. **2. Nanning (city) Intelligence Substation.** Responsible for reconnaissance and intelligence collection operations oriented towards Vietnam and the South China Sea. Altogether there are 6 personnel assigned. **3. Shanghai (city) Substation.** Responsible for reconnaissance and intelligence collection operations oriented towards the United States. Altogether there are 2 personnel assigned. **4. Changsha (city) Substation.** Responsible for reconnaissance and intelligence collection operations oriented towards Vietnam. Altogether there are 3 personnel assigned. 5. Xinjiang and Tibet Directions: Let the Shenzhen Current Political Intelligence Department be responsible for it. Altogether has 5 people. Hereafter, the staffing and organizational structure can still carry out corresponding restructuring according to higher authority requirements and realistic operational requirements, and the relevant intelligence substation functions. Its goal is to better accomplish the various missions endowed by higher authorities according to the ever changing international and domestic security situations.
**Attachment: Shenzhen Station Staffing and Personnel Organizational Structure Table**
**Shenzhen XXX Consultant Corporation**
2009-08-10
**Key Words: staffing; organizational structure; report**
**Report Copy:** XX Intelligence Department Filing Copy
Contractor: XXX Company Contact: Contact Telephone:

132

# Exhibit 13.d

# Attached Document Re: Collection Equipment Plan Chart

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



91-1300 Enterprise Avenue
Kapolei, HI 96707

Task Number(s) and Date Completed:    325950, 9/29/2014

Source Language(s):    Chinese

Target Language:    English

VERBATIM TRANSLATION

Abbreviations:

| | |
|---|---|
| *Italics* | Written in English in the source material |
| [*sic*] | The content is provided as it appears as in the source material |
| TN: | Translator's Note |

**(2009) Intelligence No. 10**                                                        *XX*

## Collection Equipment Plan Chart

**Collection Equipment Plan Chart**

| Name | Quantity | Note | Cost |
|---|---|---|---|
| Investigative System | 9 | 1 – 2 for each investigative direction | 250,000 |
| Remote Scanning System | 1 | Look for remote host computer vulnerability | 40,000 |
| Mail Detection  and Searching Platform | 1 | Automatic mail achieving system | 20,000 |
| *Internet Explore [sic] Exploit* | 1 | *IE* vulnerability exploit system | 200,000 |
| *Yahoo XSS/COOKIS Exploit* | 1 | *YAHOO* vulnerability exploit system | 40,000 |
| *Hotmail XSS Exploit* | 1 | *HOTMAIL* vulnerability exploit system | 30,000 |
| *RPC remote Exploit* | 1 | *RPC* vulnerability exploit system | 70,000 |
| *Apache Remote Exploit* | 1 | *APACHE* vulnerability exploit system | 100,000 |
| *MS OFFICE EXCEL Exploit* | 1 | *EXCEL* bundle vulnerability exploit system | 50,000 |
| *MS OFFICE WORD Exploit* | 1 | *WORD* bundle vulnerability exploit system | 70,000 |
| *MS OFFICE PPT Exploit* | 1 | *PPT* bundle vulnerability exploit system | 40,000 |
| *Adobe PDF Reader Exploit* | 1 | *PDF* bundle vulnerability exploit system | 80,000 |
| *MS IIS Remote Exploit* | 1 | *IIS* remote leakage vulnerability exploit system | 170,000 |
| *Ms Local Exploit* | 1 | Microsoft *windows* local privilege escalation tool | 30,000 |
| Total: 1,190,000 (One million one hundred and ninety thousand) | | | |

135

Above are planned expenditures for September 2009 to September 2010.  Based on changes in

operation direction and market situation, next year's figures may change.

**Shenzhen *XXX* Consulting Company**

August 10, 2009

**Key Word:  Collection Equipment    Development    Report**

Copy: *XX* Intelligence Division                                        File                    Set

Organizing Unit:  *XXX* Company        Contact Person:                Contact Telephone:

136

# Exhibit 14

# E-mail and Attached Document Re: C-17 and Metadata

137

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



11000 Wilshire Blvd., Suite 1700
Los Angeles, CA 90024

Task Number(s) and Date Completed:    #234052, 2/12/2014

Source Language(s):                          Chinese

Target Language:                              English

VERBATIM TRANSLATION

Abbreviation:    *Italics*                          Original text in English

138

**From:** *"Stephen Subin"* <span style="background:black"> </span> >
**To:** <span style="background:black"> </span>
**Subject:** Document No. 17
**Date:** *Wed, 3 Feb 2010 14:46:10 +0800*
Please receive the mail, remaining unchanged.


*Best regards,*


Steve Subin

Lode Technology Co., Ltd.

Building 1-1, Caiman Street Dieshu, No. 67 Chaoyang Road, Chaoyang District, Beijing. Zip code: 100123

*Building 1-1, No. 67 Caiman Street Chaoyang Road, Beijing P. R. China，ZIP: 100123*

Direct line: ▇▇▇▇

*Direct line:* ▇▇▇▇

Mobile: ▇▇▇▇ (3G)

*Mobile:* ▇▇▇▇ (3G)

Telephone: ▇▇▇▇    Fax: ▇▇▇▇

*TEL:* ▇▇▇▇    *FAX:* ▇▇▇▇

*Skype:* ▇▇▇▇

*Hotmail:* ▇▇▇▇

*webfax:* ▇▇▇▇

*P Before printing, think about the environment*

P Think about our environment and trees before printing. Save paper.

139

████████████

Uniqueness of data is the manifestation of value. The C-17 aircraft design was completed in 1991, and began outfitting in the Air Force in 1995. Therefore, documents of the aircraft design phase should all be documents before 1995. Please have them pay attention to this status.

After discussion with the general engineer, the value of C-17 data is as follows:

Because our program still follows the Russian route, the significance of drawing lessons/reference from C-17 is greater than the significance of actual application.

The advance quality of the C-17 aircraft lies in the adaptability, easy maintainability and reliability of the runway.

The adaptability of the runway enables the aircraft to use over ten thousand airfields in the world, and thereby truly accomplish global reach.

The reliability achieves 98%, that is to say, after each mission, only 2% of the aircraft need maintenance, while C-5 and C-141 only achieves 40%.

- The value of complete design blueprints should be around 1 million RMG
- The ████████████ is willing to pay 500K RMB for documents of the testing category
- The complete use manual should get 500K RMB
- The value of the F-117 engine complete document is fairly big, engine is the major problem of domestic programs.
- The value of complete use document, breakdown reports should be able to get 500K also
- The value of electronic system document is far less than F35
- The value of the aircraft landing gear, increase ascension system, and structure is high.

Uniqueness of the document, (I've) asked people in the industry, nobody has ever seen C-17 documents

Workflow is as follows: still take the catalog first, take samples, and then go to the system to look for the general engineer to negotiate the value, bid must be for the whole!!! This is a relatively safe way.

| 12/22/2009 | 02 - General Vehicle | This is a very valuable part |
|---|---|---|
| 02/25/2009 | 04 - Support Equipment | |
| 10/29/2008 | 05 - Aircraft safety and protection | |
| 04/23/2009 | 07 - Jacking and Stabilization | |
| 05/07/2008 | 08 - Leveling, weight, balance, defueling | |
| 08/14/2008 | 09 - Towing, taxiing | |
| 08/12/2009 | 10 - Parking & mooring | |
| 07/10/2009 | 11 – Placards & Markings | |
| 04/07/2009 | 12 - Servicing, Cleaning | |
| 12/30/2009 | 21 - Condition Air & Cab Press | |
| 08/10/2009 | 22 - Auto Flight System | |
| 08/10/2009 | 23 - Comm | |
| 06/17/2009 | 24 - (& 39) Electrical Power | |
| 12/28/2009 | 25 - Accommodations | |
| 05/20/2008 | 26 - Fire Protection | |

140

| | | |
|---|---|---|
| 12/09/2009 | 27 - Flight Controls | |
| 12/07/2009 | 28 - Fuel Systems | |
| 12/02/2009 | 29 - Hydraulic Power | |
| 08/14/2009 | 30 - Ice, Rain Protection | |
| 01/06/2010 | 31 - Indicating and Data Recording | |
| 01/04/2010 | 32 – Landing Gear Systems | |
| 01/15/2010 | 33 - Lighting | |
| 09/04/2009 | 34 - NAV-HUD, Mission computer | |
| 01/29/2009 | 35 - Oxygen | |
| 11/29/2009 | 36 - Bleed Air | |
| 08/03/2009 | 38 – Water & Waste | |
| 10/15/2009 | 39 - Electrical Components | |
| 12/08/2009 | 40 - Systems Integration | |
| 01/12/2010 | 41 – Mission Systems | |
| 11/30/2009 | 47 - OBIGGS | |
| 08/13/2009 | 49 - APU | |
| 11/19/2009 | 52 - Doors | |
| 11/10/2009 | 53 - Fuselage | |
| 12/09/2009 | 54 - Nacelle & Pylon | |
| 11/18/2009 | 55 - Stabilizer | |
| 09/11/2009 | 56 - Windows | |
| 12/30/2009 | 57 - Wing | |
| 01/13/2009 | 70 - Engine Standard Practices | |
| 10/15/2009 | 71 – Power plant | |
| 11/16/2009 | 72 - Engine | |
| 12/19/2009 | 73 - EEC | |
| 04/09/2009 | 74 - Engine Ignition | |
| 04/28/2009 | 75 - Engine Air | |
| 12/23/2009 | 76 - Engine Controls (TMD) | |
| 07/25/2006 | 77 - Engine Indicating | |
| 11/25/2008 | 78 - Engine Exhaust | |
| 12/08/2008 | 79 - Engine Oil | |
| 08/18/2008 | 80 - Engine Start | |
| 02/24/2009 | 93- Tactical Electronic Warfare | |
| 11/02/2009 | 95 - Escape, FEDS | |
| 05/19/2009 | Aircraft Systems | |
| 03/18/2009 | Avionics Backshop | |
| 04/03/2009 | ELEN Backshop | |
| 01/18/2009 | Engine Intake_ Ring Cowling | |
| 03/26/2009 | FTD Trainers | |
| 08/20/2008 | FTR Slider Replacement | |
| 12/23/2009 | General Elec-Electronic Ref | |
| 02/25/2009 | HSC 180 Day Proposal | |
| 11/25/2009 | LAMM | |
| 10/26/2009 | OFPLS | |
| 01/06/2010 | SFDR | |
| 07/27/2009 | Structures & Mission Systems | |

141

Metadata for attached document:



142

# Exhibit 15

# E-mail and Attached Document Re: C-17 and Metadata

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



11000 Wilshire Blvd., Suite 1700
Los Angeles, CA 90024

Task Number(s) and Date Completed:    #234052, 2/12/2014

Source Language(s):                Chinese

Target Language:                   English


VERBATIM TRANSLATION


Abbreviation:    *Italics*            Original text in English

144

*From:* "Stephen Subin" █████████████ >
*To:* ████████████████████████
*Subject:* RE: C-17 _2
*Date:* Sat, 23 Jan 2010 21:53:47 +0800

████████████

Judging from its name, the document looks fine.

*Best regards,*

*Steve Subin*

*Lode Technology Co., Ltd.*

Building 1, No. 67 Caiman Street Financial Center, Chaoyang Road, Chaoyang District, Beijing. Zip code: 100025

*Building 1, No. 67 Caiman Street Chaoyang Road, Beijing P. R. China，ZIP: 100025*

Direct line: █████████████

*Direct line:* █████████████

Mobile: ████████████████████ *(3G)*

*Mobile:* ████████████████████ *(3G)*

Telephone: ████████   Fax: ████████

*TEL:* ████████   *FAX:* ██████████

*Skype:* █████████

*Hotmail:* ████████████████████████████

*webfax:* █████████████

*P Before printing, think about the environment*

P Think about our environment and trees before printing. Save paper.

145

*From:* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
*Sent: Thursday, January 21, 2010 7:43 PM*
*To: Stephen Subin*
*Subject: C-17 _2*


The password remains unchanged. Please write me a document about which ones are important, which ones are not important and what they are.

| | | | |
|---|---|---|---|
| 08/10/2009 | 01:48 PM | \<DIR\> | 23 - Comm |
| 06/17/2009 | 12:58 PM | \<DIR\> | 24 - (& 39) Electrical Pwr |
| 12/28/2009 | 08:56 PM | \<DIR\> | 25 - Accommodations |
| 05/20/2008 | 07:55 AM | \<DIR\> | 26 - Fire Protection |
| 12/09/2009 | 11:54 AM | \<DIR\> | 27 - Flight Controls |
| 12/07/2009 | 12:50 PM | \<DIR\> | 28 - Fuel Systems |
| 12/02/2009 | 01:14 PM | \<DIR\> | 29 - Hydraulic Power |
| 08/14/2009 | 08:45 PM | \<DIR\> | 30 - Ice, Rain Protection |
| 01/06/2010 | 12:07 AM | \<DIR\> | 31 - Indicating and Data Recording |
| 01/04/2010 | 10:32 PM | \<DIR\> | 32 – Landing Gear Systems |
| 01/15/2010 | 08:49 PM | \<DIR\> | 33 - Lighting |
| 09/04/2009 | 08:55 PM | \<DIR\> | 34 - NAV-HUD, Mission computer |
| 01/29/2009 | 12:26 PM | \<DIR\> | 35 - Oxygen |
| 11/29/2009 | 02:09 AM | \<DIR\> | 36 - Bleed Air |
| 08/03/2009 | 10:37 PM | \<DIR\> | 38 – Water & Waste |
| 10/15/2009 | 01:19 PM | \<DIR\> | 39 - Electrical Components |
| 12/08/2009 | 12:18 AM | \<DIR\> | 40 - Systems Integration |
| 01/12/2010 | 06:37 PM | \<DIR\> | 41 – Mission Systems |
| 11/30/2009 | 03:52 PM | \<DIR\> | 47 - OBIGGS |
| 08/13/2009 | 01:31 PM | \<DIR\> | 49 - APU |
| 11/19/2009 | 02:18 PM | \<DIR\> | 52 - Doors |
| 11/10/2009 | 05:18 PM | \<DIR\> | 53 - Fuselage |
| 12/09/2009 | 02:22 PM | \<DIR\> | 54 - Nacelle & Pylon |
| 11/18/2009 | 04:05 PM | \<DIR\> | 55 - Stabilizer |
| 09/11/2009 | 11:13 AM | \<DIR\> | 56 - Windows |
| 12/30/2009 | 02:01 AM | \<DIR\> | 57 - Wing |
| 01/13/2009 | 03:55 PM | \<DIR\> | 70 - Engine Standard Practices |
| 10/15/2009 | 05:23 PM | \<DIR\> | 71 - Powerplant |
| 11/16/2009 | 02:44 PM | \<DIR\> | 72 - Engine |
| 12/19/2009 | 10:43 PM | \<DIR\> | 73 - EEC |
| 04/09/2009 | 07:21 AM | \<DIR\> | 74 - Engine Ignition |
| 04/28/2009 | 10:41 PM | \<DIR\> | 75 - Engine Air |
| 12/23/2009 | 04:55 AM | \<DIR\> | 76 - Engine Controls (TMD) |
| 07/25/2006 | 04:09 PM | \<DIR\> | 77 - Engine Indicating |
| 11/25/2008 | 12:18 PM | \<DIR\> | 78 - Engine Exhaust |
| 12/08/2008 | 10:26 PM | \<DIR\> | 79 - Engine Oil |
| 08/18/2008 | 11:20 PM | \<DIR\> | 80 - Engine Start |
| 02/24/2009 | 05:52 AM | \<DIR\> | 93- Tactical Electronic Warfare |
| 11/02/2009 | 11:05 AM | \<DIR\> | 95 - Escape, FEDS |
| 08/06/2009 | 10:20 PM | 3,940,864 | AC ASGN_ Config 4 Aug 09.xls |
| 03/03/2009 | 01:39 PM | 70,144 | Acronyms.xls |
| 05/19/2009 | 11:37 AM | \<DIR\> | Aircraft Systems |
| 03/18/2009 | 06:46 AM | \<DIR\> | Avionics Back shop |
| 04/03/2009 | 01:35 PM | \<DIR\> | ELEN Back shop |
| 01/18/2009 | 01:33 PM | \<DIR\> | Engine Intake_ Ring Cowling |
| 03/26/2009 | 03:25 PM | \<DIR\> | FTD Trainers |

147

```
08/20/2008  12:06 PM   <DIR>        FTR Slider Replacement
12/23/2009  07:56 AM   <DIR>        General Elec-Electronic Ref
02/25/2009  01:39 PM   <DIR>        HSC 180 Day Proposal
02/02/2009  10:03 AM   <DIR>        Images
11/25/2009  08:29 AM   <DIR>        LAMM
10/26/2009  12:23 PM   <DIR>        OFPLS
03/02/2009  02:57 PM       1,472,512 PTP-124_Retrofit_Configs_19 Feb 2007 - SW.ppt
01/27/2009  08:07 AM          52 SDS Link.txt
01/06/2010  12:14 AM   <DIR>        SFDR
07/31/2009  01:56 PM          603 Shortcut to electrical-reference-files on ███████
████████████
07/27/2009  12:26 PM   <DIR>        Structures & Mission Systems
```

Judging from the names of these documents all look very good. It should be very good if there is content. The titles are no problem with the titles. This is C-17 electronic mission system, electronic war, engine, etc. If the content is very detailed, it should be able to turn into a 2000,000 Renminbi like.

148

149

Metadata for attached document:

Properties of 附录3

General | Description | Custom Properties | Internet | Security | Statistics

附录3.docx

Type:                   MS Word document
Location:
Size:                   13 KB (13,102 Bytes)

Created:                01/23/2010, 13:40:00, Stephen Subin
Modified:               01/23/2010, 13:50:00, Stephen Subin
Digitally signed:                                                          Digital Signature...
Last printed:
Total editing time:     00:00:10
Revision number:        1
☑ Apply user data                                                          Reset

Template:               Normal

OK    Cancel    Help    Reset