# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
LAWRENCE S. BADER
BENJAMIN S. FISCHER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
BRIAN A. JACOBS
JUDITH L. MOGUL
JODI MISHER PEIKIN
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION
212-880-9520
ranello@maglaw.com

COUNSEL
JASMINE JUTEAU

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

July 12, 2016

**VIA ECF**

Honorable Christina A. Snyder
United States District Judge
Central District of California
600 U.S. Courthouse
312 N. Spring Street
Los Angeles, California 90012

Re:    United States v. Su Bin, 14-131(C)-CAS

Dear Judge Snyder:

This firm represents Su Bin, or Stephen, the defendant in the referenced case. Yesterday the government filed an additional Sentencing Position, Dkt. 86 ("Reply"), in response to Stephen's Sentencing Position filed on July 6, 2016, *see* Dkt. 81 ("Position"). Sentencing is scheduled for this Wednesday, July 13, 2016, at 12:00 p.m. We write briefly to address several matters raised in the Reply and to reiterate the appropriateness of a 30-month sentence for Stephen.

## A Variance Is Amply Justified

The government dedicates the bulk of its Reply to addressing the three issues under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") left open by the parties' Plea Agreement. Although Stephen explained at length in his Position, *see* pp. 17-29, why he is deserving of a variance under the factors set out in 18 U.S.C. § 3553(a), the government dedicates just three pages to those issues. *See* Reply at 19-21.

Particularly lacking is the government's attempt to distinguish the recent 30-month sentence imposed in another district in a factually similar Arms Export Control Act ("AECA") case. In *United States v. Kan Chen*, Docket Number 16-11-SLR (D. Del.), the defendant, like Stephen, pled guilty to conspiracy to violate AECA in violation of Title 18, United States Code, Section 371, but also, unlike Stephen, pled guilty to a substantive AECA violation and to a

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Honorable Christina A. Snyder
July 12, 2016
Page 2

violation of the International Emergency Economic Powers Act, in violation of Title 50, United States Code, Sections 1702 and 1705.

The government here argues that *Chen* is not an "apt comparison" to Stephen's case because *Chen* involved mere "rifle scopes," whereas the present case involved items of "strategic significance." Reply at 19-20. But the government's own sentencing submission in *Chen* undermines this argument. In *Chen*, the government claimed that the defendant had compromised "one of the most significant war-fighting advantages our military has," namely, "the ability to effectively maneuver and fight at night, under cover of darkness" using "superior night vision and thermal imaging rifles scopes." *Chen*, Docket Entry 33 at 7. The government further claimed that by "exporting such devices in such a prolific manner, the defendant has increased the chances that such items have fallen or will fall into enemy hands for either use on the battlefield, or to reverse engineer the technology to degrade our military advantage." *Id.* Faced with these arguments, the district court in *Chen* imposed a sentence of 30 months. *See Chen*, Docket Entry 37.

In the present case, the government's Reply attempts to distinguish *Chen* by claiming, in a single conclusory sentence, that the national-security implications of Stephen's conduct were somehow more significant than the implications of Chen's conduct. But the government's description of the national-security concerns at issue in *Chen* was far more detailed and specific than anything the government has presented in this case. Nothing in the government's Reply supports sentencing Stephen to a longer prison term than the 30-month sentence Chen received.

More generally, the government has not meaningfully responded to the facts that: Stephen did not profit from the offense; the offense was an aberration in a lifetime of generosity and kindness toward others; and Stephen has already faced sufficient deterrence in his almost 25 months' in custody, the impact on his family, friends and employees; and Stephen will be permanently saddled with this conviction, which will among other things constrain his efforts to do business going forward. Stephen knows that he has harmed many people who cared for him. He is sorry for his actions, and Stephen intends to return to being a positive force in society, caring of other people, and committed to social justice.

## Mr. Sestak's Cost Estimate of Less Than $750,000 Remains the Most Reliable

Mr. Sestak has produced the most reliable cost estimate in the record, and the government's arguments to the contrary are unpersuasive. First, despite the government's complaints that his analysis is not sufficiently tied to a substantive review of each technical order, *see* Reply at 2, neither Mr. Sestak *nor* the government's expert Colonel Myers produced a page-by-page review of the hundred-plus page technical orders. Both declarants instead created a cost estimation methodology that assesses the overall complexity of the technical orders and then calculates a cost based on certain fixed assumptions. Mr. Sestak's model was simply more accurate because he accounted in greater detail and sophistication for various factors affecting the cost estimate than Colonel Myers did. Specifically, he better addressed the varying

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Honorable Christina A. Snyder
July 12, 2016
Page 3

complexity of technical orders, the fact that the 2010 cost estimates do not align with the most labor-intensive period of developing technical orders (when costs would have been much lower), and efficiencies that result from aircraft programs that have reached maturity.

Mr. Sestak was not, as the government claims, confused about Colonel Myers's methodology. *See* Reply at 3. Where he uses numbers different from hers (in some cases higher than her cost estimates), the differences reflect the fact that the technical orders were not of uniform complexity and he has tried to account for that. *See* Def.'s Ex. 20, Dkt. 81, ¶¶ 22-24. Likewise, despite the government's assertion that his declaration does not provide a guide to his results, *see* Reply at 3, Mr. Sestak's calculations are sufficiently clear. He used engineering costs ranging from $100 to $400, and hours-per-page estimates ranging from 2.05 to 8.2 hours, tied to the apparent complexity of the technical orders, *see* Def.'s Ex. 20, Dkt. 81, ¶ 24, which values are also designed reflect a gradation in costs to account for the aging for the program, *see id.* ¶ 26. He also applied a 25% reduction to the costs as a whole to appropriately reflect the fact that the C-17 program reached maturity in 1995, whereas Colonel Myers estimates the cost of production fifteen years later, in 2010. *Id.* ¶ 28.

The government's argument that Colonel Myers's cost estimate is conservative in light of these factors, Reply at 4, misses the mark. Using average costs incorporates work of varying difficulty without attempting to separate out what work would have been done in 2010 on these particular technical orders. Colonel Myers's cost estimate was not conservative; instead, it does not sufficiently address various cost structures to be reliable.

Further, the government's contention that the technical orders do not incorporate public information is misplaced. *See* Reply at 2-3. For example, Technical Order 00-105E-9 is readily available online, *see* http://www.0x4d.net/files/AF1/R11%20Segment%205.pdf, and shows significant informational overlap with two of the seven technical orders, about the hydraulic system and its reservoirs and about the Onboard Inert Gas Generating system.

Meanwhile, the government's attempts to buttress its use of Stephen's scattered valuations or the expenses incurred by the co-conspirators accomplish only the opposite. Although the government asserts that Stephen would have seen *some* of the data, *see* Reply at 6-7, that only underscores the fact that he did not see the "complete" sets to which he assigned values. Nor has the government shown (or even alleged) that such sets were obtained. The valuations are therefore too speculative under the circumstances to support a loss amount finding. The government makes almost no effort to tie the operating expenses it relies on to any of the conduct with which Stephen was involved—in particular, any attempt to explain how the purchase of three vehicles would have related to that conduct. *Compare* Def.'s Objections to the PSR, Dkt. 82, at 10, *with* Reply at 7-8. Instead, the government merely states that projects referenced in the other men's reports (which Stephen did not see) include projects Stephen was involved with. *See* Reply at 7-8. However, what statement fails to adequately address the limited extent to which Stephen was involved in the overall work the other men did, which was extensive. The government's relative lack of argument on these two points suggests that it is

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Honorable Christina A. Snyder
July 12, 2016
Page 4

simply deferring to Colonel Myers's estimate, but the greater detail used by Mr. Sestak makes his estimate more reliable.

### Stephen Was a Substantially Less Culpable Participant

Nothing the government asserts in its Reply changes the fact that Stephen was an ancillary part of the conspiracy. The government claims that Stephen was "trusted with the most sensitive details of the scheme" to imply that he was part of some inner circle. *See* Reply at 17. However, as we previously detailed, the other men appeared to be full-time intelligence personnel who merely used Stephen as a consultant when expedient. Def.'s Objections to the PSR, Dkt. 82, at 10-13. The mere fact that they used Stephen in this way does not mean, as the government argues, that they would not have been able to analyze or understand the data in Stephen's absence. *See* Reply at 18. Instead, it demonstrates their far greater operational role in the offense.

The considerations listed in application note 3(C) to Section 3B1.2 further underscore Stephen's minimal involvement. His commentary was a disproportionately small piece of the overall offense, and the other two men carried out extensive work without involving him. *See* U.S.S.G. § 3B1.2 App. Note 3(C)(i). The offense was initiated by the other two men, and although Stephen commented and gave guidance on data, that data was presented to him by the other two men. *See id.* App. Note 3(C)(ii). Stephen was not, with that backdrop, the decision-maker in the group. *See id.* App. Note. 3(C)(iii).

Further, he did not, as the government has already admitted, "personally gain unauthorized access to the victim companies' computers," Dkt. 75 at 3, meaning he did not participate in the primary conduct of the two object offenses. *See* U.S.S.G. § 3B1.2 App. Note 3(C)(iv). Contrary to the government's assertion, merely reviewing the documents that had been obtained does not constitute significant participation on Stephen's part. *See* Reply at 17. And although Stephen has admitted he was part of the conduct for purposes of commercial gain, he did not in fact receive any money or other benefits from the conduct; nor is it clear that he was ever in a position to. *See id.* App. Note 3(C)(v). The fact that he speculated on value on a handful of scattered occasions does not suggest otherwise. Indeed, Stephen's ultimate conclusion was that the men were never likely to be a position to sell any data.

### A Section 2B1.1(b)(13) Enhancement Remains Inappropriate

Finally, although the government has now submitted two conclusory affidavits attempting to satisfy its burden of demonstrating value from secrecy, the declarations do not support that conclusion at the time the documents in question were obtained. Mr. Korstian's declaration discusses an F-35 flight test plan that he says was finalized in August 2001. Korstian Decl., ¶ 3. But the document was not obtained until May 2012, over ten years later. Reply at 11. Mr. Korstian does not discuss the document's status in 2012, and the fact that the document may have been a trade secret in 2001 does not mean it was in 2012, over five years

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Honorable Christina A. Snyder
July 12, 2016
Page 5

after the plane completed its first flight, see https://www.f35.com/about/history. Likewise, Mr. Desimini characterizes as valuable a document used for an informal training in March 2004. Desimini Decl., ¶ 4. But nothing in that declaration demonstrates that the document had any residual value from secrecy when it was obtained over six years later, Reply at 13.

Further, the government's continued reliance on metadata to demonstrate that Stephen actually typed certain passages into specific documents still comes up short. The government claims that metadata showing Stephen edited a report containing a reference to the Chinese military is proof that he knew data would benefit the Chinese government. *See* Reply at 15-16. However, the fact that Stephen edited the reports in question does not mean that he inserted the specific references the government relies on to show intent. Instead, the various versions of the report the government cites do not appear to add up to a complete drafting history, and no evidence shows Stephen had any appreciation from the drafting (or anywhere else) that the information might benefit a foreign government. Indeed, the offense as a whole is incompatible with Stephen having such intent. Stephen has already admitted that he was part of the offense at least in part for commercial gain (although no such gain ever materialized), and a small part of his conduct involved providing high-level valuations to the other men, who also appeared motivated by commercial gain. If, as the government alleges, those two men were affiliated with the Chinese military, there would have been no need to sell the data on; the other men should have been the destination of the information, or a conduit to that destination. Yet, that is not what the government alleges happened, and not what the Plea Agreement sets out.

For all the foregoing reasons, we continue to urge the Court to impose on Stephen a sentence of 30 months.

Respectfully submitted,

Robert J. Anello